UNITED STATES, Appellant

v

HAROLD R. CONLON, Airman First Class, U. S. Air Force, Appellee

14 USCMA 84, 33 CMR 296

No. 16,618

June 21, 1963

*Lieutenant Colonel Emanuel Lewis* argued the cause for Appellant, United States.

*Major William A. Crawford, Jr.,* argued the cause for Appellee, Accused. With him on the brief were *John C. Humpage, Esquire,* and *Colonel Daniel E. Henderson, Jr.*

## Opinion of the Court

KILDAY, Judge:

Accused was convicted by a general court-martial, convened at Forbes Air Force Base, Kansas, of three specifications alleging larceny of Government property, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to bad-conduct discharge, confinement at hard labor for twelve months, forfeiture of $50.00 per month for twelve months, and reduction to airman basic. The convening authority modified one of the specifications as to the value of property, but otherwise approved the findings and sentence.

A board of review in the office of The Judge Advocate General of the Air Force found that the alleged stolen property was secured as the result of an illegal search and seizure, and set aside the findings and sentence and ordered the charges dismissed.

Under the provisions of Article 67 (b) (2), Uniform Code of Military Justice, 10 USC § 867, The Judge Advocate General of the Air Force has certified the case to this Court on the following issue:

"WAS THE BOARD OF REVIEW COR-RECT IN ITS DETERMINATION THAT THE PROPERTY IN QUESTION (PROSECUTION EXHIBITS 1 THROUGH 24) WAS OB-TAINED BY AN ILLEGAL SEARCH AND SEIZURE AND THEREFORE IMPROPERLY RECEIVED IN EVIDENCE OVER OBJEC-TION OF THE ACCUSED?"

In view of the question certified, we shall limit our statement of the facts to those necessary to a resolution thereof. Accused was the tenant of a garage and his rent thereon was paid through the month of March 1962. He had resided in an apartment to the front of the garage, but had moved very shortly before the incident here involved. A Mrs. Stichler was tenant of another house at the same location. The apartment, house, and garage, were owned by the same person and the same real estate agent handled the rental of all three properties. Mrs. Stichler and the real estate agent were both of the opinion that the garage was appended to her house and rented by her with her house. However, accused had originally been a subtenant of the former occupant and had later rented the garage directly from the absentee owner. Accused had the door to the garage secured by a padlock and the door thereof was further protected by a burglar alarm.

On March 24, 1962, with permission

of the real estate agent, Mrs. Stichler cut the padlock on the garage with a hacksaw. Thereupon the bell of the burglar alarm began to sound. Being unable to disconnect the same, Mrs. Stichler, without looking into the garage, hurried to a telephone and called police. Two patrolmen responded. With Mrs. Stichler, they entered the garage and disconnected the bell. Neither of the patrolmen testified. Apparently because of something observed by them, they called a city detective who responded. The detective did not testify, but it was stipulated he had no search warrant. Apparently because of something observed by the detective, he called the Air Police, and Sergeant Hart, an Air Policeman, responded. Hart testified that when he arrived at the garage he had a conversation with the detective about items in the garage which appeared to be Government property; that he looked into the garage and saw articles which were purportedly Government property, part of which property he saw from the door; but that he did not know whether he could see any of the twenty-four articles, marked as exhibits before the court, from the door. Sergeant Hart was asked:

"TC: Sergeant Hart, prior to entering the garage, and standing at the doorway, could you see any items that would lead you to believe they were Government property?

. . . . .

"A. I could, Sir.

"Q. Would you describe that property to the court?

"A. I could see a buffer that had '55 AEMS' visible on it.

"Q. What does that mean—'55 AEMS'?

"A. 55th Armament Electronics Maintenance Squadron.

"Q. Is that a squadron here at Forbes?

"A. Yes, Sir."

Sergeant Hart summoned Mr. Tighe, a Special Agent for the Office of Special Investigations, who went to the garage. Mr. Tighe testified that when he arrived Mrs. Stichler advised him she had full control of the garage. She requested him to remove all the property in the garage. However, he removed only what appeared to be Government property. The record reflects that, in addition to the twenty-four items involved in the specifications in this case, the garage contained a large number of other articles bearing markings indicating Government ownership, and other property as well.

The law officer developed the following from the agent:

"Q. What caused you to go to the garage on the 24th of March?

"A. I had received a telephone call from the Topeka Police Department Dispatcher who advised me that Sergeant Hart from the Air Police Investigation at Forbes had requested my presence at the garage at the rear of 1612 Tyler Street, as there appeared to be a considerable amount of Government property locked in there.

"Q. When you got to the garage, you say you went into the garage alone?

"A. I did, Sir.

"Q. You found Prosecution Exhibits 1 through 24. Where were these exhibits when you went into the garage?

"A. These exhibits were contained within barrels, boxes, and loosely lying on the floor of the garage.

"Q. Upon walking into the garage, just as you get to the door, can you see this property laying in the garage? Is it behind something, or closed in closets?

"A. The property was seen from the doorway.

"Q. In other words, you did not search for the property; it was in clear sight when you walked in the door?

"A. This is correct. Now, standing in the door with me were also three other persons—Detective Cook, Mrs. Stichler, and Sergeant Hart. I then entered the garage after Mrs. Stichler had advised me that she had complete custody of the garage.

. . . . .

"Q. When you went to the garage —went through the door—was this property that you found in this garage—where was it? In a pile, in the middle of the floor, or stacked on shelves, or in closets—where was it?

"A. It was in boxes, small barrels, loose, on the floor, lying against the sides of the garage.

"Q. Could you see immediately that some of this property appeared to be Government property?

"A. It did, Sir.

"Q. At least, some?

"A. Yes, Sir.

"Q. I understood from the Cross-Examination that you could not tell on the small items whether they had Government serial numbers until you took them out of the barrels and un-wrapped them.

"A. This is true; however, there were many items that I could see from the door, that you could also see the Federal stock number, or '55 A & E' on them.

"Q. What is '55 A & E'?

"A. 55th Armament Electronics Maintenance Squadron.

"Q. That is a squadron here at Forbes?

"A. It is, Sir.

"Q. And the remainder of the property wasn't hidden?

"A. Some items were in manu-facturer's boxes—

"Q. You're talking about manu-facturer's boxes; is that—

"A. Some items were in manufac-turer's boxes, and some in boxes which could be obtained through grocery stores."

Although there is extensive examina-tion and cross-examination as to the conditions under which the property was observed and the garage entered, we believe the law officer, through the above questions, summed up the situa-tion correctly. That is, there was quite a large number of items in the garage, which a view from the door quite clear-ly indicated were Government property, due to numbers, markings and packag-ing. In addition, there were boxes and barrels which contained other items. An examination of the items in the con-tainers was necessary to secure their markings or stock numbers, and deter-mine therefrom such items to be Gov-ernment property. The twenty-four items admitted in evidence as exhibits come from such barrels, boxes, or con-tainers.

There is no evidence in this record that Mrs. Stichler, in sawing the lock from the garage door, was doing any-thing other than attempting to enter upon or use premises to which she claimed the right to possession as a tenant thereof. Nothing suggests that she had any prior contact with the police. Neither is there anything to indicate she was acting in cooperation with any Governmental agency—local, military or Federal. In Burdeau v Mc-Dowell, 256 US 465, 65 L ed 1048, 41 S Ct 574 (1921), the Supreme Court said:

"The 4th Amendment gives pro-tection against unlawful searches and seizures, and, as shown in the previ-ous cases, its protection applies to governmental action. Its origin and history clearly show that it was in-tended as a restraint upon the activi-ties of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the pur-pose of the 4th Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued."

The actions of Mrs. Stichler, a pri-vate citizen, did not militate against the legality of the search. █ Bacon v United States, 97 Fed 35 (CA 8th Cir) (1899); United States v Volante, 4 USCMA 689, 16 CMR 263; United States v Rogan, 8 USCMA 739, 25 CMR 243. See also, United States v Seiber, 12 USCMA 520, 523, 31 CMR 106.

City police officers, responding to a call that a burglar alarm was sounding, and upon arriving finding such to be true, were clearly acting reasonably when they entered such premises and

**87**

disconnected the alarm. Testimony of the officers first to arrive is not before us. However, the testimony of the air policeman summoned by them shows the presence of numerous items, obviously Government property, in a position to be seen, and which were seen from the door and without entering the opened door. Likewise, the agent of the Office of Special Investigations had such a view when he reached the door of the garage. We, therefore, conclude that the actions of the police, both municipal and military, were reasonable and they therefore lawfully entered the garage.

Appellate defense counsel contend that even though we should conclude that the officers were legally upon the premises, still the seizure of the property was illegal. In this connection, we quote from the most recent expression of the Supreme Court in this particular area, United States v Rabinowitz, 339 US 56, 94 L ed 653, 70 S Ct 430 (1950):

"What is a reasonable search is not to be determined by any fixed formula. The Constitution does not define what are 'unreasonable' searches and, regrettably, in our discipline we have no ready litmus-paper test. The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case. Go-Bart Importing Co. v United States, 282 US 344, 357, 75 L ed 374, 382, 51 S Ct 153. . . .

"Assuming that the officers had time to procure a search warrant, were they bound to do so? We think not, because the search was otherwise reasonable, as previously concluded.

• • • • •

". . . The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment."

Cf. Trupiano v United States, 334 US 699, 92 L ed 1663, 68 S Ct 1229 (1948), expressly overruled on this question in United States v Rabinowitz, supra.

We conclude that the action of the Air Force representatives in taking the property into their possession was reasonable, and therefore, lawful. As we have previously concluded, they were lawfully in the garage. Therein they were confronted by a mound of property containing markings clearly indicating their Government character. Actually, some of the items bore the particular markings of an Air Force Squadron stationed at a nearby Air Force Base. A lady was present who asserted she was entitled to the exclusive possession of the garage. She demanded, or requested, that all property be removed therefrom. Confronted with that situation, the Air Force investigator responded by removing only what appeared to be Government property. From the "facts and circumstances—the total atmosphere" of this particular case, we are bound to conclude the action taken was reasonable. See Ellison v United States, 206 F2d 476 (CA DC Cir) (1953); Woodard v United States, 254 F2d 312 (CA DC Cir) (1958); Von Eichelberger v United States, 252 F2d 184 (CA 9th Cir) (1958); Sartain v United States, 303 F2d 859 (CA 9th Cir) (1962).

Appellate defense counsel, among other cases, cite: Taylor v United States, 286 US 1, 76 L ed 951, 52 S Ct 466 (1932); Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948); Chapman v United States, 365 US 610, 5 L ed 2d 828, 81 S Ct 776 (1961). There are very material differences between this case and those just cited. In the present instance there is no evidence any of those connected with the discovery and seizure of the property involved had any information that property had been stolen, that they suspected the accused of any offense, or that the search and seizure was for the purpose of securing evidence to be used against the accused or

any other person. The fact that Government property had been stolen became known only after the property was discovered and seized. One or more of such factors is present in each of the above-cited cases and others of similar import.

The same is not true, however, in the case at bar. Moreover, here military agents—who had lawfully gained knowledge that an unusually large quantity of Government property was located on the premises—were faced with the prospect that a woman claiming the right of possession of the garage was about to cast out and discard all items therein. Certainly it was reasonable, if not obligatory—if only for the purpose of safeguarding the same—that Government property found under the circumstances of this case be taken into possession by the Air Force representative who came upon it. The United States was indisputably entitled to possession of the items, and the agents acted reasonably in taking them into custody. See Davis v United States, 328 US 582, 90 L ed 1453, 66 S Ct 1256 (1946); Harris v United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098 (1947); United States v Sellers, 12 USCMA 262, 30 CMR 262.

The certified question is, therefore, answered in the negative and the decision of the board of review is reversed. The record will be returned to The Judge Advocate General of the Air Force for reference to the board of review for further action not inconsistent with this opinion.

QUINN, Chief Judge (concurring):

Refined concepts of the real property law or the tort law of a particular state are not determinative of the constitutional reasonableness of police action. Cf. Chapman v United States, 365 US 610, 5 L ed 2d 828, 81 S Ct 776 (1961). What is important is whether considering the "total atmosphere of the case" it was reasonable for the police to act as they did. United States v Rabinowitz, 339 US 56, 66, 94 L ed 653, 660, 70 S Ct 430, 435 (1950).

Whether Mrs. Stichler was technical-

ly a trespasser is, in my opinion, immaterial to the determination of the legality of the search. She believed, with excellent reason, that she was entitled to possession of the garage. The authorized agent of the owner who rented the adjacent house to her believed the garage was part of the rented premises; and he gave her express permission to take possession of it under the terms of her lease. At the time of the search, therefore, all parties on the scene believed that Mrs. Stichler was entitled to control of the garage. It is unreasonable to require the police to get a search warrant in this situation. Why should they do so? Must they search the land records, or otherwise ascertain the exact legal interest in the premises of the person in apparent control, before they respond to a request to investigate and take possession of seemingly abandoned property, which bears a clear indication that it was stolen? I think not. See Sartain v United States, 303 F2d 859 (CA 9th Cir) (1962).

As far as the "total atmosphere" presented to the police was concerned, they had the specific consent of the person in ostensible control of the garage to take possession of the property. If Mrs. Stichler had actual legal control over the garage, there certainly could be no objection to the police response to her request. Sartain v United States, supra; Woodard v United States, 254 F2d 312 (CA DC Cir) (1958). The fact that she might have been mistaken as to her legal right to possession, does not, in my opinion, change the situation confronting the police. The Constitution does not require the police to disregard information presented to them in good faith, to make an independent investigation of various legal interests in premises they are *asked* to enter. I, therefore, join in answering the certified question in the negative, and in reversing the decision of the board of review.

FERGUSON, Judge (dissenting):

I dissent.

The shield of the Fourth Amendment of the Constitution is, indeed, manu-

factured of the sheerest gossamer if it cannot repel an invasion of the right to be free from unreasonable searches and seizures such as that depicted in this record. I am firmly convinced that our forefathers—their ears ringing with the memory of Wilkes, the *North Briton,* and the infamous Writs of Assistance—built more strongly. The sort of search involved here is in violation of the Constitution. Absent a lawful apprehension, there cannot be a search of real property upon a showing of probable cause alone. In the language of the Supreme Court:

> "While the question has never been directly decided by this court, it has always been assumed that one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein. . . . The protecion of the 4th Amendment extends to all equally,— to those justly suspected or accused, as well as to the innocent. The search of a private dwelling without a warrant is, in itself, unreasonable and abhorrent to our laws. . . . Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, Federal or state, for the search of a private dwelling house without a warrant. Absence of any judicial approval is persuasive authority that it is unlawful. . . . Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause." [Agnello v United States, 269 US 20, 32, 70 L ed 145, 46 S Ct 4 (1925).]

Clearly, one's privately rented garage is considered to be protected from searches and seizures in the same manner as one's actual home "without regard to whether . . . [it] constituted part of the private dwelling." Taylor v̇ United States, 286 US 1, 76 L ed 951, 52 S Ct 466 (1932). Accordingly, I am of the view that my brothers are wrong in their answer to the certified issue, and I shall hereinafter point out wherein I believe their reasoning goes astray.

The facts are as related in the principal opinion. Briefly restated, they indicate that a Mrs. Stichler, under the honest impression she was entitled to the possession of the garage, demised in actuality to the accused, made a forcible entry into it. When a burglar alarm sounded, responding police understandably entered and disconnected it. They in turn summoned air police, who, without entering upon the premises at all, were able to view numerous items of Government property, as did the agent of the Office of Special Investigations who ultimately arrived on the scene.

All of this, however, is merely frosting on the cake, for none of these plainly visible items are involved in the case before us. Rather, the allegedly stolen property admitted in evidence was obtained by the agent through entry into the garage, without the consent or presence of the person entitled to its possession, and search of various boxes and barrels belonging to him. It is this ultimate search and seizure with which we are concerned, and it is on its legality that the propriety of the board of review's decision depends.

Undoubtedly, Mrs. Stichler, a trespasser, had no connection with either the local or Federal authorities. Had she examined the contents of the boxes and barrels and turned the items in question over to the Federal officers, under the present state of the law, there could be no question of their admissibility. As Burdeau v McDowell, 256 US 465, 65 L ed 1048, 41 S Ct 574 (1921), notes, the protection of the Fourth Amendment applies "to governmental action . . . as a restraint upon the activities of sovereign authority." But, if its principle is to be applied, the police must not become involved in either the search or the seizure of the property. "The crux of . . . [the] doctrine is that a search is a search by a Federal official if he had a hand in it; it is not a search by a federal official if evidence . . . is turned over to the federal authorities on a silver platter." Lustig v United

States, 338 US 74, 78, 93 L ed 1819, 69 S Ct 1372 (1949).

As the record here shows, Mrs. Stichler did no searching. The police came when the burglar alarm sounded and notified Federal authorities, who themselves came to the scene, conducted the search, and seized the goods in question. And, in view of the alarm's clangor, one can hardly say, as does the concurring opinion, that the garage was "seemingly abandoned." Thus, as in the *Lustig* case, in which a Federal agent merely assisted local officers in evaluating evidence which the latter had uncovered, this became a Federal search to which the *Burdeau* rule is inapplicable. Mrs. Stichler was a trespasser, and her presence and assertion of dominion over accused's garage could confer upon the officers no authority whatsoever to enter the garage and remove any items. As was noted in Byars v United States, 273 US 28, 71 L ed 520, 47 S Ct 248 (1927), at page 33:

"We do not question the right of the federal government to avail itself of evidence improperly seized by state officers operating entirely upon their own account. But the rule is otherwise when the federal government itself, through its agents acting as such, participates in the wrongful search and seizure. To hold the contrary would be to disregard the plain spirit and purpose of the constitutional prohibitions intended to secure the people against unauthorized official action. The 4th Amendment was adopted in view of long misuse of power in the matter of searches and seizures both in England and the colonies; and the assurance against any revival of it, so carefully embodied in the fundamental law, is not to be impaired by judicial sanction of equivocal methods, which, regarded superficially, may seem to escape the challenge of illegality but which, in reality, strike at the substance of the constitutional right."

See also Gambino v United States, 275 US 310, 72 L ed 293, 48 S Ct 137 (1927), wherein responsibility for an illegal search conducted by volunteers was imputed to the United States when its sole purpose was to obtain evidence for a Federal prosecution, and Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948).

Nor does United States v Rabinowitz, 339 US 56, 94 L ed 653, 70 S Ct 430 (1950), in any way support my brothers' conclusion that this search of real property was reasonable and not in violation of the Constitution. The language upon which they rely is lifted bodily from its frame of reference and thrust forward as being meaningful in itself. Far from standing for the proposition for which it is cited, the case involves only the question whether it was necessary for Federal officers to secure a warrant in order to conduct a search *incident to a lawful arrest.*

In that case, agents arrested the defendant in his office under the authority of a lawful warrant. Incident to that arrest, they searched his desk, safe, and filing cabinets, finding the evidence ultimately used against him. Reviewing its decisions, the Supreme Court pointed out that the right so to search premises incident to a lawful arrest had long been settled. Specifically overruling Trupiano v United States, 334 US 699, 92 L ed 1663, 68 S Ct 1229 (1948), the Court held that a search warrant need not "be procured when 'practicable' in a case of search incident to arrest." United States v Rabinowitz, supra, at page 64. And I specifically invite attention to the portion of the quotation from that case which the majority omit in their opinion:

". . . Reasonableness is in the first instance for the District Court to determine. We think the District Court's conclusion that here the search and seizure were reasonable should be sustained because: (1) *the search and seizure were incident to a valid arrest;* (2) the place of the search was a business room to which the public, including the officers, was invited; (3) the room was small and under the immediate and complete control of respondent; (4) the search did not extend beyond the room used for unlawful purposes; (5) the possession of the forged and altered

**91**

stamps was a crime, just as it is a crime to possess burglars' tools, lottery tickets or counterfeit money." [Emphasis supplied.] [United States v Rabinowitz, supra, at page 63.]

Moreover, the Court went on in *Rabinowitz*, supra, to distinguish Taylor v United States, supra, on the basis that it should be restricted "to the familiar situation there presented," *i. e.*, that " 'No one was within the place [searched] and there was no reason to think otherwise.' " It was declared of *Taylor*, supra, at page 64:

". . . Lest the holding that such a search of an unoccupied building was unreasonable be thought to have broader significance the Court carefully stated in conclusion: 'This record does not make it necessary for us to discuss the rule in respect of searches in connection with an arrest. No offender was in the garage; the action of the agents had no immediate connection with an arrest. The purpose was to secure evidence to support some future arrest.' " [Emphasis supplied.]

The *Rabinowitz* case, therefore, does not stand for the proposition for which it is cited, *i.e.*, that a dwelling or other building may be searched and items therein seized for use in evidence if such action be based upon probable cause. To the contrary, it reaffirms the court's earlier holding in *Taylor*, supra, that there cannot be any search of a garage without a warrant, no matter what degree of probable cause exists. Indeed, insofar as I have been able to determine, the Supreme Court has never abandoned its insistence that, except in the case of searches incident to an arrest, there can be no unwarranted search and seizure of private premises. Taylor v United States, supra; Johnson v United States, supra; Ker v California, 374 US 23, 10 L ed 2d 726, 83 S Ct 1623, decided June 10, 1963.

Nor is *Rabinowitz*, supra, the "most recent expression of the Supreme Court in this particular area." In Chapman v United States, 365 US 610, 5 L ed 2d 828, 81 S Ct 776 (1961), the Court pointedly reaffirmed the vitality of Taylor v United States, supra, and

Agnello v United States, supra, under facts strikingly similar to those before us. In that case, a landlord went to a home in order to invite a new tenant to attend church. There was no response to his knock, and he noticed a strong odor of mash. He summoned local police who, with his permission, entered the premises through a window and discovered a large still. Federal officers were called and, while they were *en route*, defendant returned to his "home" and was arrested by the local officers. The Federal men arrived, took custody of the defendant, obtained samples of mash from the house, photographed the still, and destroyed both it and its contents.

Reiterating that " 'one's house cannot lawfully be searched without a search warrant, except as an incident to a lawful arrest therein,' " the Court held the search clearly illegal under Federal standards. Chapman v United States, supra, at page 613. It declared, at page 615:

"We think it must be concluded here . . . that 'If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required.' "

The reasoning of the Court was that the landlord had no right to authorize the officers to enter upon the premises and examine its interior. *A fortiori*, in this case, Mrs. Stichler, who, despite her honest belief to the contrary, had no interest in the garage at all, could not give to the officers the slightest authority to search the barrels and boxes stored therein or to seize their contents.

Thus, the Constitution has always been construed to safeguard the citizen against what is held, as a matter of law, to be unreasonable search, regardless of how sound a foundation the police may have had for their quest. For two hundred years, the judiciary has pointed out that probable cause cannot, in and of itself, make a search reasonable, as:

". . . It is not fit, that the receiving or the judging of the information

should be left to the discretion of the officer. The Magistrate ought to judge, and give certain directions to the officer. This is so, upon reason and convenience." [Money v Leach, 3 Burr, 1742, 97 Eng Rep 1075 (1765).]

This is the nub of my disagreement with my brothers. It is their position that police action, based upon probable cause alone, constitutes a reasonable search. All of the authorities are to the contrary, and I cannot join with them in thus lightly depriving the accused of his constitutional protection. Undoubtedly, there was shown in this record probable cause to search the gar-

age, but that serves only to authorize the issuance of a warrant by a proper magistrate. It cannot be used by the officers as a substitute for the necessary writ. Agnello v United States, supra; McDonald v United States, 335 US 451, 93 L ed 153, 69 S Ct 191 (1948). Indeed, why should officers ever subject themselves to the descriptive limitations of a search warrant when, as in this case, they may search without restriction upon probable cause alone! I, therefore, record my fundamental disagreement with my brothers' position.

I would answer the certified question in the affirmative, and affirm the decision of the board of review.