UNITED STATES, Appellant

v

CHARLES A. GARLICH, Airman E–3, U. S. Naval Reserve, Appellee

15 USCMA 362, 35 CMR 334

No. 18,266

May 7, 1965

*Commander Max S. Ochstein,* USNR, argued the cause for Appellant, United States.

*Lieutenant John Thomas Montag,* USNR, argued the cause for Appellee, Accused.

## Opinion of the Court

KILDAY, Judge:

Accused was tried by special court-martial, convened aboard ship by the Commanding Officer of the U. S. S. SARATOGA, charged under one specification with unauthorized absence for a period of seven hours and fifteen minutes, in violation of Article 86, Uniform Code of Military Justice, 10 USC § 886; one specification of failure to obey paragraph 1269, U. S. Navy Regulations, 1948, by possession of six miniature bottles of liqueurs, in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892; and five specifications of larceny of property from five different owners, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He pleaded guilty to the first two charges and not guilty to the larceny counts. He was found guilty of all of the charges and specifications with some exceptions and substitutions as to the larceny specifications. He was sentenced to a bad-conduct discharge, confinement at hard labor for six months, forfeitures, and reduction to pay grade E-1. The convening authority and the officer exercising general court-martial jurisdiction approved the sentence.

A board of review in the office of The Judge Advocate General of the Navy reversed the findings of guilty of all five specifications of larceny and ordered them dismissed. The findings of guilty of the remaining charges and specifications and only so much of the sentence as provided for forfeitures and confinement at hard labor for six months were affirmed by the board.[1]

---

[1] Prior to the action by the board of review, the Under Secretary of the

The Acting The Judge Advocate General of the Navy has, pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, certified the case to this Court on the following issue:

"Was the Board of Review correct in holding as a matter of law that the search and seizure was illegal and that the subsequent confessions by the accused were the product of an illegal search and seizure and accordingly setting aside the findings of guilty pertaining to Charge III and the specifications thereunder?"

It is evident the only question requiring our decision is the legality of the search and seizure, as the determination of that question will determine the admissibility of the confessions subsequently made by the accused.

In United States v Rabinowitz, 339 US 56, 63, 66, 94 L ed 653, 70 S Ct 430 (1950), the Supreme Court said:

". . . The recurring questions of the reasonableness of searches must find resolution in the facts and circumstances of each case.

. . . . .

". . . The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case."

It is, therefore, necessary that we examine quite carefully into the facts and circumstances of this particular case and the total atmosphere of it.

Mrs. Nancy Glover purchased a 1960 Vauxhall automobile sometime between March and October 1963. The title to the car was in her name, but the certificate of title was in the physical possession of the lienholder, General Motors Acceptance Corporation. The car having become inoperable because "of a thrown rod in the motor" it was placed on the premises of a Mr. and Mrs. Lawhorn. Mr. Lawhorn was engaged by Mrs. Glover to repair the automobile. Subsequent thereto, in November 1963, Mrs. Glover sold, or agreed to sell, the inoperable automobile to the accused.

The rather unorthodox arrangement as to the sale of the automobile, at the trial, was shown by a stipulation as to the testimony which would be given by Mrs. Glover, if present, in the following language:

"That in November 1963, subsequent to the return of the SARATOGA from the Mediterranean, I agreed to sell the Vauxhall to Charles A. Garlich, airman, USNR, who was assigned to the same division as my husband. The terms of this sale were that Garlich was to and did pay me $230.00 down to be forwarded to the finance company plus $50.00 for my equity in the automobile, plus one payment of $27.00 which was to be forwarded to the finance company for one payment that was past due. He was then to continue to pay me the monthly payments still due which I was to forward to GMAC. Payments have been made by me with money furnished by Garlich through January 1964. As of 1 January there was approximately $48.00 owed by Garlich.

"That despite this agreement to sell the automobile to Garlich, no changes have been made in the title presently held by GMAC which is in my name. Although it was agreed between Garlich and myself that if he could make arrangements with GMAC to assume the payments on the note for the balance due GMAC, the title would be changed over to his name."

On the evening of December 31, 1963, accused entered the home of Mr. and Mrs. Lawhorn where a New Year's celebration was in progress. One Ayo, a cousin of Mrs. Lawhorn, and one Whitaker, both shipmates of accused, were present at the celebration. Accused, upon entering the home, requested a key to the Vauxhall automobile

Navy had taken action to suspend the bad-conduct discharge with automatic remission and remitted the forfeitures upon completion of the minimum period of confinement.

stating that he wanted to get "some stuff" out of the car. At this time the automobile was immobile, its engine having been completely dismantled for repairs by Mr. Lawhorn. The accused was given the key and a flashlight, for it was dark outside, and he left. He returned in about thirty minutes, surrendered the key and flashlight and departed. Mrs. Lawhorn "thought it was kind of funny that Garlich had stayed in the car that long." Ayo, Whitaker, and Mr. Lawhorn then went outside and, using a flashlight, looked into the car through its window. No one opened the car doors or the trunk at that time. Ayo saw two tape recorders and a box with one Rogers' name and address on it which was on top of a parachute bag on the back seat. Rogers was a sailor stationed on the same ship. According to Ayo, there was a sea bag on the front seat. He did not notice any identification on either the parachute bag or on the sea bag. Upon reentering the house, Ayo's cousin (Mrs. Lawhorn) asked him "to tell . . . [his] division officer, master-at-arms or Legal Officer and have them come out here the next day so that they could confiscate the gear and everything." Ayo returned to the ship and reported all of the circumstances to the Junior Officer of the Day, Mr. Adams. Mr. Adams ordered one Kline, the ship's master-at-arms, to investigate the matter. The master-at-arms office had received a theft report concerning a tape recorder before the ship arrived back from the Mediterranean. Kline obtained a statement from Ayo and Whitaker. According to Kline, it was common knowledge in the division that Garlich was buying a car from Mrs. Glover. Kline also talked with the husband of Mrs. Glover, a sailor stationed on the same ship, who informed him that his wife still held title to the car. Kline also consulted with the legal officer of the ship. Thereafter, on January 1, 1964, at the direction of the ship's legal officer, he obtained Mrs. Glover's permission to search the Vauxhall automobile. At about 2:30 p.m., January 1, 1964, Mr. Lawhorn gave Kline permission to come on his property for the purpose of searching the 1960 Vauxhall and

permission further to remove from his premises any articles found therein. At that time, Kline testified, the car was not mobile as the engine was torn down, and none of the car's compartments were locked. Through the window of the car Kline saw a regulation type green parachute bag and a tape recorder on the back seat. Kline did not testify that he personally knew of a report of a stolen tape recorder, although such a report had been made to his office, nor did he testify to any fact which would indicate he recognized any of the property as stolen. The items of property which were observed through the window of the automobile and those contained in the closed parachute bag were inventoried and returned to the ship. These items were the subject of some of the specifications under Charge III. A locked sea bag was found in the trunk of the car and was returned to the ship unopened. The next day, on January 2, the accused was warned under Article 31, advised that he was not required to consent to opening the locked sea bag, and he gave his consent. The accused, also following warning, consented to the search of another automobile which he owned. A radio headset, three red flight deck shirts, and one green flight deck shirt were found in this second car. The items found in the second automobile, plus a sheath knife from the dismantled automobile, were the subject of the larceny alleged in all of the remaining specifications of Charge III save one. On January 13, 1964, the accused made a confession concerning all of the items of property alleged under Charge III except for the tape recorder alleged in specification 5. On January 21, 1964, the accused confessed concerning the tape recorder.

I

The Government contends, as it did at trial and before the board of review, that accused was not the owner in possession of the Vauxhall and therefore had no standing to complain of the validity of the search. To the contrary, the defense, in objecting to the admission of this evidence at time of trial and since, has argued vigorously that the accused *is* the true owner of the

**365**

automobile; that Mrs. Glover possessed neither the power nor the authority to authorize this search; and that the search and seizure being illegal, since it was conducted without proper consent and without a warrant, all of the evidence thereof, including the subsequent confessions of the accused, was tainted and inadmissible. The board of review went even further and held that "It was not necessary to decide whether or not the accused 'owned' the automobile in question. . . . even if the accused had the status of a mere invitee or guest using the automobile as dead storage space and with but bare permission that status alone gave him, in the circumstances here, a standing to object."

The Fourth Amendment to the Constitution of the United States provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

As a general proposition, the accused, in order to have standing to complain of an unlawful search and seizure, must show an interest in the premises searched or the property seized. McDonald v United States, 335 US 451, 93 L ed 153, 69 S Ct 191 (1948). With reference to the necessity to show an interest in the premises searched, the Supreme Court in a unanimous opinion by Justice Frankfurter in Jones v United States, 362 US 257, 266, 267, 4 L ed 2d 697 (Annotated at page 1999), 80 S Ct 725, 78 ALR2d 233 (1960),[2] abandoned all "subtle distinctions, developed and refined by the common law in evolving the body of private property law" and gave standing to complain to one whose only claim lay in the fact that he was a mere invitee lawfully upon the premises. The Court acknowledged that it was departing, although not lightly so, from a number of lower court decisions, but did so on the ground that:

". . . Distinctions such as those between 'lessee,' 'licensee,' 'invitee' and 'guest,' often only of gossamer strength, ought not to be determinative in fashioning procedures ultimately referable to constitutional safeguards.

. . . . .

". . . we ought not to bow to them in the fair administration of the criminal law. To do so would not comport with our justly proud claim of the procedural protections accorded to those charged with crime. No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him."

The decision in *Jones* was presaged by its previous holding in United States v Jeffers, 342 US 48, 96 L ed 59, 72 S Ct 93 (1951). *Jeffers* was concerned with the search of a hotel room without a warrant but upon consent of a hotel employee. The defendant, a nephew of the two ladies who alone rented the room and paid the rent, had a key to the room and their permission to use it at will. They did not give him permission to store the narcotics that were found therein. On the day of the search, one Roberts sought out the house detective, Scott, and offered him $500.00 to let him in the room. Roberts told Scott that the defendant had "some stuff stashed" in the room. Scott notified the local police. They knocked at the door and receiving no reply, obtained a key from the assistant manager, entered the room, and, in the absence of the two ladies and the defendant, conducted a detailed search. The narcotics were found in a box on a closet shelf.

---

[2] Justice Douglas concurred in this particular issue but dissented to the Court's holding that there was probable cause for the issuance of the warrant.

The Government argued that the search did not invade the defendant's privacy and that he lacked the necessary standing to suppress the seized evidence. In affirming the Court of Appeals decision that the Government's action was in violation of the Fourth Amendment, the Court stated:

". . . To hold that this search and seizure were lawful as to the respondent would permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right. The respondent unquestionably had standing to object to the seizure made without warrant or arrest. . . ." [*Ibid*, 342 US, at page 52.]

In Chapman v United States, 365 US 610, 616, 5 L ed 2d 828, 81 S Ct 776 (1961), a landlord noted a strong "odor of mash" about a tenant house. Receiving no response to his knock he called the local police. They, upon his authorization, entered the house through an unlocked window and found the necessary materials for the operation of a distillery. The Government contended that the landlord had "an absolute right to enter the demised premises 'to view waste,' and that he should be able to exercise that right through law enforcement officers to whom he had delegated his authority." In holding the search and seizure unlawful, the Court stated:

". . . There are several answers to this contention. First, here the landlord and the officers forced open a window to gain entry to the premises. Second, 'their purpose in entering was [not to view waste but] to search for distilling equipment. . . .' Jones v United States, supra (357 US at 500). Third, to uphold such an entry, search and seizure 'without a warrant would reduce the [Fourth] Amendment to a nullity and leave [tenants'] homes secure only in the discretion of [landlords].' Johnson v United States, supra (333 US at 14)."

See also Taylor v United States, 286 US 1, 76 L ed 951, 52 S Ct 466 (1932); and Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948).

And in Stoner v California, 376 US 483, 489, 11 L ed 2d 856, 84 S Ct 889 (1964), the Court held unlawful the search of the petitioner's hotel room without a warrant but upon consent of the night clerk. In doing so, the Court stated:

"It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. *It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent*." [Emphasis supplied.]

In all of the above-cited cases, the Court stressed the need for police officers to obtain a warrant prior to the institution of a search. As set forth in *Chapman*, supra, 365 US, at page 615:

"We think it must be concluded here, as it was in Johnson, that 'If the officers in this case were excused from the constitutional duty of presenting their evidence to a magistrate, it is difficult to think of a case in which it should be required.' 333 US, at 15. See also Lustig v United States, 338 US 74, 93 L ed 1819, 69 S Ct 1372; United States v Rabinowitz, 339 US 56, 94 L ed 653, 70 S Ct 430; United States v Jeffers, 342 US 48, 96 L ed 59, 72 S Ct 93; Jones v United States, 357 US 493, 2 L ed 2d 1514, 78 S Ct 1253."

And in *Jeffers*, supra, 342 US, at page 51:

"The Fourth Amendment prohibits both unreasonable searches and unreasonable seizures, and its protection extends to both 'houses' and 'effects.' Over and again this Court has emphasized that *the mandate of the Amendment requires adherence to judicial processes*. See Weeks v United States, 232 US 383, 58 L ed 652, 34 S Ct 341, LRA1915B 834, Ann Cas 1915C 1177 (1914); Agnello v United States, 269 US 20, 70 L ed 145, 46 S Ct 4, 51 ALR 409 (1925). Only where incident to a valid arrest, United States v Rabinowitz, 339 US 56, 94 L ed 653, 70 S Ct 430 (1950)

or in 'exceptional circumstances,' Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948) may an exemption lie and *then the burden is on those seeking the exemption to show the need for it,* McDonald v United States, 335 US 451, 456, 93 L ed 153, 158, 69 S Ct 191 (1948)." [Emphasis supplied.]

What then of the case at bar? It is clear that if Garlich had *no* interest in the situs of the search, he had no standing to complain of an invasion of his privacy. And it is just as clear from the Government's own evidence that he had *some* interest. The extent of this interest is not controlling so long as it is sufficient to be equated to at least that of a mere invitee lawfully upon the premises. Jones v United States, supra. Under the circumstances of this case we believe that his interest in the car can be so equated. Not only is this interest represented by his financial transactions with Mrs. Glover, as noted above, but also by the fact that on the evening in question, when the accused requested the key in order to get "some stuff" out of the car, no one questioned his right to do so. This presupposes that he had previously stored some things in the car or that items in the car at the time of sale belonged to him by reason thereof. It was only upon Mrs. Lawhorn's realization that Garlich had stayed in the car a long time that anyone's suspicions were aroused.

While the car was originally purchased by Mrs. Glover and the title was in her name, the certificate of title was in the physical possession of GMAC, the lienholder, pending payment of the final amount due, "approximately $48.00." Mrs. Glover had disposed of her entire financial interest in the car to the accused and only a formality remained to effectuate a transfer of the title to his name, a formality to which she had assented. We decline to speculate as to the reason for accused's failure to complete this part of the transaction. Be that as it may, the fact remains that Mrs. Glover's only remaining interest was that of a bare legal titleholder, and while this may have entitled her to some interest in the car, it did not dispossess the accused of his personal interest. The Government contends that since the car was still physically located where Mrs. Glover had placed it for repairs, on the property of Mr. Lawhorn, that the accused had never actually taken possession of the auto. The short answer to this is that the car was inoperable at the time of purchase and could not be self-moved. Garlich had agreed to reimburse Lawhorn for his work and was awaiting completion thereof. His constructive possession of the car could hardly be clearer.

Similarly, Mr. Lawhorn, who was repairing the automobile, might be in a position to claim some sort of interest as the holder of a mechanic's lien, for the value of his services, but this too falls short of depriving the accused of standing.

In short, three persons had a right of entry into this car, for various reasons, without being guilty of a trespass. Had either Mrs. Glover or Mr. Lawhorn entered the car, *in line with their particular interests,* and in doing so had seen the stolen articles and reported their observations to the proper authorities, this information together with other evidence reflecting the probability of theft might very likely have been a sufficient basis on which to obtain a warrant to search from the appropriate magistrate. See Johnson v United States, supra. But the search here was without a warrant and was not of this nature. Neither of these persons entered the car.[3] Only the

---

[3] We are not concerned with whether Mrs. Glover or Mr. Lawhorn might have taken the articles from the car and given them to the police, absent evidence of cooperation with the authorities, for, as stated in Burdeau v McDowell, 256 US 465, 65 L ed 1048, 41 S Ct 574 (1921), "The 4th Amendment . . . . was intended as a restraint upon the activities of soverign authority, and was not intended to be a limitation upon other than governmental agencies." See also United States v Seiber, 12 USCMA 520, 31 CMR 106; United States v Conlon, 14 USCMA 84, 33 CMR 296.

police entered. "It was precisely the kind of search by policemen for evidence of crime against which the constitutional prohibition was directed." United States v Blok, 188 F2d 1019, 1021 (CA DC Cir) (1951). In *Blok*, the defendant's superiors gave the police permission to search her desk, which was located on Government property. The court held this to be an unreasonable search and seizure since it violated her right of privacy under the Fourth Amendment. In analyzing this situation, the court said:

". . . No doubt a search of it without her consent would have been reasonable if made by some people in some circumstances. Her official superiors might reasonably have searched the desk for official property needed for official use. . . . [But they] could not reasonably search the desk for her purse, her personal letters, or anything else that did not belong to the government and had no connection with the work of the office. Their consent did not make such a search by the police reasonable."

See also *Chapman, Jeffers,* and *Stoner,* all supra. Cf. United States v Battista, 14 USCMA 70, 33 CMR 282.

The constitutional right to immunity from unreasonable searches and seizures is personal. As such it can be waived only by the person holding such right "by *word or deed,* either directly or through an agent." (Emphasis supplied.) Stoner v California, supra. There is in this case no evidence that the accused waived his constitutional privilege.

It goes without saying that an automobile comes within the purview of the Fourth Amendment. Carroll v United States, 267 US 132, 69 L ed 543, 45 S Ct 280, 39 ALR 790 (1925); Brinegar v United States, 338 US 160, 93 L ed 1879, 69 S Ct 1302 (1949); Preston v United States, 376 US 364, 11 L ed 2d 777, 84 S Ct 881 (1964). In Dalton v State, 230 Ind 626, 105 NE2d 509, 31 ALR2d 1071 (1952), an automobile was held to be an "effect."[4] In *Dalton,* where the certificate of title was in the wife's name but the car was used by the appellant, the court said:

". . . The *right of possession* is of sufficient interest in the subject matter of a search to entitle appellant to the protection of the constitution. Shepherd v State, 1928, 200 Ind 405, 164 NE 276. . . .

"The state takes the position that the wife of appellant was authorized to consent to the search, and hence waive appellant's constitutional immunity. There is no evidence in this record that appellant ever gave his wife any authority whatever to consent to any search of his premises, or the car which was in his possession near his home, and certainly the law should not imply any such consent from the mere fact that he was away and the wife was at home with the children. United States v Rykowski, DC 1920, 267 F 866, 871; Humes v Taber, 1850, 1 RI 464; State v Wilkerson, 1942, 349 Mo 205, 212, 159 SW2d 794; Underhill, Criminal Evidence (4th Ed) pp 1456, 1457, § 800; Cornelius, Search & Seizure (2d Ed) § 24, p 71; Maupin v State, 1927, 38 Okl Cr 241, 260 P 92.[5] The burden was on the state to show appellant had authorized his wife to consent to the search." [Emphasis supplied.] [Dalton v State, supra, at pages 511–512.]

We are not here concerned with whether or not a wife may consent to the search of property in which she and her husband have a joint interest (State v Pina, 94 Ariz 243, 383 P2d 167 (1963); People v Carter, 48 Cal 2d 737,

---

[4] Section 11, Article 1, Constitution of Indiana, is identical with the Fourth Amendment to the United States Constitution.

[5] Often the consent of the wife to officers, who purport to act in their official capacity, has been held given under coercion. Amos v United States, 255 US 313, 65 L ed 654, 41 S Ct 266 (1921); State v Lindway, 131 Ohio St 166, 2 NE2d 490 (1936); People v Lind, 370 Ill 131, 18 NE2d 189 (1938).

312 P2d 665 (1957)), for Mrs. Glover bore no such relationship to Garlich. What we are concerned with is whether her interest in the Vauxhall was sufficient to override the accused's right to privacy under the Fourth Amendment. Under the peculiar circumstances of this case and in light of the authorities cited, we think not.

Our references to *Carroll* and *Brinegar,* supra, underline the fact that we are aware of the somewhat different rules that have been adopted with reference to searches of automobiles as contrasted with searches of homes and other structures. These rules were bottomed on the mobility of the *ordinary* automobile, "because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought" (Carroll v United States, supra, 267 US, at page 153). However, the liberal rule enunciated in *Carroll* was limited in Henry v United States, 361 US 98, 104, 4 L ed 2d 134, 80 S Ct 168 (1959), wherein it was stated:

> "The fact that the suspects were in an automobile is not enough. Carroll v United States (US) supra, liberalized the rule governing searches when a *moving* vehicle is involved. But that decision merely relaxed the requirements for a warrant on grounds of practicality. It did not dispense with the need for probable cause." [Emphasis supplied.]

See also Preston v United States, supra; United States v Herberg, 15 USCMA 247, 35 CMR 219.

In the case at bar, the vehicle in question was not only not moving, but was incapable in its present condition of being self-propelled. As such it more closely represented a structure on a piece of real property and the liberal rules of *Carroll* do not appear applicable. In addition, it is to be noted that the investigators were not operating on the basis of the existence of probable cause for, at the direction of the ship's legal officer, they had obtained permission from Mrs. Glover to search the car and from Mr. Lawhorn to come upon his property in connection therewith. Admittedly, they were acting under what they believed to be a valid consent to search. But no one thought it necessary to obtain Garlich's permission despite their knowledge of his interest in the car. It might be argued that Garlich was absent without leave on that day and he so admitted by his plea. However, this unauthorized absence did not begin until the time at which the search commenced and the record is silent as to his whereabouts during the period of Kline's presearch investigation.

Assuming *arguendo,* however, that the search was based on the existence of probable cause, were the facts herein sufficient to support such a view? We think not. The investigator Kline had received a report that a seaman had placed some articles in a car which he was in the process of purchasing. He viewed the articles through the car window and saw a tape recorder, a package addressed to a third person, and a Government issue parachute bag. He did not testify that he had personal knowledge or even received reports that any of this property was stolen. For aught this record shows at this point in the investigation, each piece of property enumerated might just as reasonably have been lawfully in accused's possession. Also, there was no showing of a need for immediate action as the car was immobile and could be locked by Mr. Lawhorn, assuring against removal of the property while the investigation progressed since the accused obviously had no key. As stated by the Supreme Court in Henry v United States, 361 US 98, 102, 4 L ed 2d 134, 80 S Ct 168 (1959):

> "Evidence required to establish guilt is not necessary. Brinegar v United States, 338 US 160, 93 L ed 1879, 69 S Ct 1302; Draper v United States, 358 US 307, 3 L ed 2d 327, 79 S Ct 329. On the other hand, good faith on the part of the arresting officers is not enough. Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed. Stacey v Emery, 97 US 642, 645, 24 L ed

1035, 1036. And see Director General v Kastenbaum, 263 US 25, 28, 68 L ed 146, 147, 44 S Ct 52; United States v Di Re, supra (332 US at 592); Giordenello v United States, supra (357 US at 486). It is important, we think, that this requirement be strictly enforced, for the standard set by the Constitution protects both the officer and the citizen. If the officer acts with probable cause, he is protected even though it turns out that the citizen is innocent. Carroll v United States, 267 US 132, 156, 69 L ed 543, 552, 45 S Ct 280, 39 ALR 790."

And in Rios v United States, 364 US 253, 261, 4 L ed 2d 1688, 80 S Ct 1431 (1960):

". . . The seizure can survive constitutional inhibition only upon a showing that the surrounding facts brought it within one of the exceptions to the rule that a search must rest upon a search warrant. Jones v United States, 357 US 493, 499, 2 L ed 2d 1514, 1519, 78 S Ct 1253; United States v Jeffers, 342 US 48, 51, 96 L ed 59, 63, 72 S Ct 93."

The Government calls our attention to United States v Eldridge, 302 F2d 463 (CA 4th Cir) (1962), and to our own case of United States v Conlon, 14 USCMA 84, 33 CMR 296, in support of its contention that the search was lawful.

In *Eldridge*, a bailee in actual physical possession of the car gave police permission to search the trunk thereof. Factually, it appears the bailee's mother-in-law reported that there was a stolen rifle on the back seat of a car parked in front of her home. Because of recent local thefts of firearms, police went to investigate. Seeing the rifle *they left to secure a search warrant* and returned. Calling the bailee from the house, they asked permission to look at the rifle. This granted, they asked permission to search further. A knife and pistol were found in the glove compartment. However, as far as the record showed, none of these weapons were stolen property. In the trunk of the car the officers found and seized two stolen Coast Guard radios, which they later turned over to Federal authorities. These radios formed the basis of the action against Eldridge. The warrant was never served or shown to the bailee.

On the theory that the owner had placed no restriction on the use of the car and since access to the trunk is a normal incident to the use of an automobile, the majority of the court, although acknowledging that the defendant's interest in his own car gave him standing to complain, under Jones v United States, supra, nevertheless found that the bailee had concurrent rights with the owner and that the ensuing search by the police was not unreasonable. The dissenting member would have held the search unreasonable, citing Go-Bart Importing Co. v United States, 282 US 344, 357, 75 L ed 374, 51 S Ct 153 (1931), to the effect that each case is to be decided upon its own facts and circumstances. He questioned the probable cause for the issuance of the warrant (mere suspicion of some wrongdoing), and pointed to the fact that the police chief told the bailee that "the search was 'just a routine checkup' and did not mention any of the matters urged by the Government as constituting probable cause for the search. Had . . . [the bailee] known that the police expected to find stolen goods in the car perhaps he would not have been so free in consenting to the search. . . . This search was an exploratory one, made solely in the hope of finding stolen guns in a particular automobile." United States v Eldridge, supra, at page 468.

Since this case was not tested in the Supreme Court, we have no way of knowing what the outcome would be. However, we believe it significant to point out that it was decided after *Jones* and before *Stoner*. In the latter case the Court gave added vitality to its holding in *Jones* by restating therein that:

". . . 'it is unnecessary and ill-advised to import into the law surrounding the constitutional right to be free from unreasonable searches and seizures subtle distinctions, de-

veloped and refined by the common law in evolving the body of private property law. . . .' "

It then went on to state that:

". . . Our decisions make clear that the rights protected by the Fourth Amendment are not to be eroded by strained applications of the law of agency or by unrealistic doctrines of 'apparent authority.' " [Stoner v California, supra, at page 488.]

Additionally, it is noted that the exceptional circumstances of *Carroll* and *Brinegar* (mobility of the auto) were present in *Eldridge* and that this may account in part for the view taken by the majority. However, it is the absence of just those circumstances in the case at bar which serves to distinguish the two actions.

In United States v Conlon, supra, a trespass by a private individual, who mistakenly believed she was acting within her rights, revealed the presence of Government property in a garage. Government authorities were summoned and the trespasser demanded its removal. In that case there was no evidence that any of those connected with the discovery and seizure of the property involved had any information that property had been stolen, that they suspected the accused of any offense, or that the search and seizure was for the purpose of securing evidence to be used against the accused or any other person. In light thereof and in the face of the trespasser's threat to cast out and discard all items in the garage, we said:

". . . Certainly it was reasonable, if not obligatory—if only for the purpose of safeguarding the same —that Government property found under the circumstances of this case be taken into possession by the Air Force representative who came upon it." [United States v Conlon, supra, at page 89.]

Also determinative of the holding in *Conlon*, was the fact that from outside the garage the observers quite clearly saw markings reflecting ownership by an Air Force squadron at a

nearby Air Force base, some of it still in the manufacturers' boxes, an open indication of its Government character.

In the case at bar only the parachute bag, of those things visible from outside the car, could possibly have been considered as Government property. However, it is noted that this bag had the name of one "Lieutenant Commander Neilson" on the tag with the accused's name superimposed over it. In such a condition it might have been issued to the accused or borrowed from Neilson and not stolen at all. And there is no evidence that its presence off-ship was unusual. In the alternative, given the wide sale of surplus military items of this nature, it is just as likely that it was purchased by the accused on the open market. The factors which made the seizure in *Conlon* reasonable are just not present here.

Finally, the Government contends, that the master-at-arms had probable cause for the search on the basis of the information supplied by Ayo and Whitaker, a reported theft of a tape recorder and on the basis of what he saw through the window of the vehicle. In making this argument the Government fails to appreciate the import of Justice Jackson's words in Johnson v United States, 333 US 10, 14, 92 L ed 436, 68 S Ct 367 (1948):

". . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

"There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with. *But this is not such a case.*" [Emphasis supplied.]

Believing that the case at bar is also "not such a case," we hold, under controlling Constitutional principles as enunciated by the Supreme Court, that this search was unlawful. Such authorities, we believe, are binding in this Court. We acknowledge the fact that the officers in this case were acting

in the honest belief that only the consent of Mrs. Glover was necessary to insure the legality of the search without a warrant. But the Government's error, no matter how honest, may not be used to the detriment of the accused.

Judge Ferguson concurs in this opinion and additionally continues to adhere to the views expressed in his dissenting opinion in *Conlon*.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The principal opinion starts with the wrong premise and ends with the wrong conclusion. Whatever the accused's interest in the automobile, from which some of the articles admitted in evidence were taken, it is clear that the police officers acted reasonably under the circumstances.

From the standpoint of title, notwithstanding payment by the accused to Mrs. Glover of her "equity" interest, she was still liable on the debt to the General Motors Acceptance Corporation; and since she was still liable, she gave the accused neither the title nor the possession of the car, pending satisfaction of the entire obligation or a novation of her contract with GMAC. The stipulation of testimony indicates that "the title . . . [was to] be changed over" to the accused's name only if he "could make arrangements with GMAC to assume the payments on the note for the balance due." There is no doubt from the evidence that Mrs. Glover believed she was still the owner of the car. The accused may have had an equitable interest in the car by reason of part payment of the total purchase price, but that interest gave him no right to control the property or to assert any claim to possession.

By some strange alchemy, the board of review construed the accused's request for the key to the car "to get some stuff out of" it, as being "presumably for the purpose of *loading* it with the property" seized. (Emphasis supplied.) The majority avoids that patently erroneous interpretation of the evidence by suggesting the accused's request shows that at some earlier date he had somehow acquired permission to use the car for storage. If the accused had any such permission, the evidence of it appears nowhere in the record. Since he asserts a violation of his constitutional right against unreasonable search and seizure, the accused should be required to present at least a modicum of evidence that he was something other than a bare trespasser in leaving the articles in the car. Mrs. Glover's testimony gives no hint whatever of any previous permission to the accused to use or exercise any authority over the car for any purpose. Nor is there one bit of evidence of such permission by Mr. and Mrs. Lawhorn, on whose property the car was kept while being repaired by Mr. Lawhorn, assuming either could confer such authority upon the accused. In any event, the Lawhorns' reaction to the discovery of the articles in the car is inconsistent with any inference that they gave him permission to use it for storage. On the contrary, they suspected his purpose and went immediately to check on what he had done in the car. What they saw branded as a lie the accused's statement to them as to the purpose for which he wanted the key.

The Constitution does not prohibit every search and seizure; it operates only against a search and seizure that is *"unreasonable."* What is unreasonable depends upon the surrounding circumstances as they appear to an ordinary, conscientious police officer, and to the ordinary law-abiding citizen. Here, the police officer was authorized to remove articles left in the car without apparent permission of the owner of the car, and of the person in immediate possession of the vehicle. What is unreasonable about the officer's taking possession of the articles in response to that authority? Why should he ask the accused for permission to remove the articles, when the accused had had no right to leave them in the car in the first place? No invitee, guest, or other person, who is granted permission to enter private premises, should complain if the owner

of the premises also invites the police. Suppose a guest, without the knowledge or consent of the owner, conceals a gun on the premises; suppose, further, the owner discovers the weapon after the guest departs, and calls the police to take custody of it. May the guest object to the means by which the police obtained possession? Certainly not; and, in my opinion, that is the sum and substance of the situation here. Rees v Commonwealth, 203 Va 850, 127 SE2d 406 (1962), cert den, 372 US 964, 10 L ed 2d 128, 83 S Ct 1088 (1963), reh den, 373 US 947, 10 L ed 2d 702, 83 S Ct 1533 (1963).

If we have to disregard common sense and look only to legal precedent to support the officer's action, then the facts in this case are well within the scope of the separate opinions sustaining the seizure in United States v Conlon, 14 USCMA 84, 33 CMR 296. There, the accused rented a garage on certain premises from the absentee owner. He placed a padlock on the door. Later, a house on the premises was rented to Mrs. Stichler by a real estate agent employed by the owner. Both the agent and Mrs. Stichler believed the garage was part of the rental estate. One day, Mrs. Stichler cut the padlock to enter the garage. A burglar alarm went off and frightened her. She telephoned the police and municipal police officers responded. What they saw in the garage prompted them to call the military authorities. Later, Mrs. Stichler gave the Air Police permission to remove from the garage various articles of property. This Court sustained the action of the Air Police in removing the property. The opinion in this case seeks to distinguish Conlon. The distinction eludes me.

It is said, first, that the action of the police in Conlon was proper, because Mrs. Stichler, although a trespasser, threatened to throw out the property and the police could take it into possession for safekeeping. I did not agree with this reason for sustaining the police action, and I, therefore, separately set out my views. In my opinion, it was reasonable for the police to enter the premises on the invitation extended to them by the person who

had apparent authority to invite them in. See United States v Barone, 330 F2d 543 (CA 2d Cir) (1964), cert den, 377 US 1004, 12 L ed 2d 1053, 84 S Ct 1940 (1964). Mrs. Glover in this case was not a trespasser. She had a legal, equitable, and commonsense right to invite the police to look into, and enter, the car. She may not have threatened to throw the articles out, but she certainly was willing that the police take charge of them.

The second distinction made between this case and Conlon is, that in Conlon the officers could see, from outside the garage, markings on the property which reflected Government ownership. We are not told, however, whether the officers could conclude from the markings that the property was stolen and, therefore, was contraband; or whether it was just Government property which had to be taken into possession for protection. If the latter is the justification, it falls within the scope of the first reason, that is, since Mrs. Stichler intended to "cast out and discard all items" within the garage, they had to be taken into custody for safekeeping. United States v Conlon, supra, at page 89. But if the markings showed the articles to be the fruits of a crime then, presumably, the seizure was reasonable because stolen property in plain view at a place at which the police are legitimately present is subject to seizure. United States v Burnside, 15 USCMA 326, 35 CMR 298. The latter situation is present in this case.

The evidence shows there had been a series of thefts in the accused's division aboard the U. S. S. Saratoga. One of the personnel of the division, Hugh F. Rogers, had expected, through the mail, a package of movie film, but it did not arrive. Two members of the accused's division were present at Lawhorn's home when the accused appeared, to request the key to the car. The accused remained so long at the vehicle, that they, and the Lawhorns, suspected the announced purpose for which the key was obtained. Going to the car themselves, when the accused left, they immediately perceived the accused's declared reason to be a lie. Instead of getting something from the

car, he had obviously put things into it. Among the things they saw, from the outside of the car, were two tape recorders, a "regulation type" parachute bag, some clothing, and a parcel post package addressed to Rogers aboard the U. S. S. SARATOGA. That it was concluded these were stolen articles is manifest from the fact that Gerald A. Ayo, one of the guests, was directed to tell the division officer or the master-at-arms to "come out here . . . [to] confiscate the gear." What was obvious to the Lawhorns, and to the accused's shipmates, was at least probable to the police officer who took the goods into his possession, after he approached the car with the permission of the owner of the vehicle, and the permission of the owner of the land, on which the car was situated. See United States v Burnside, supra. According to either opinion in *Conlon*, therefore, the taking of possession of the stolen property was not unreasonable.

I also disagree with the majority on other grounds. One of the articles taken from the car was a sea bag. The bag was locked, and it was not opened until the accused told the law enforcement agents that they could cut off the lock. There is, of course, a vast difference between affirmative consent to a search and mere submission or acquiescence to the color of authority. That consent is present here as to the articles in the sea bag is manifest from the surrounding circumstances. The accused was informed of his rights under Article 31 of the Uniform Code, supra, 10 USC § 831, and explicitly advised he did not have to agree to the opening and search of his sea bag. He, thereupon, wrote out a statement in which he said, "I . . . give my consent to R. W. Kline MM1 . . . to cut the lock on my sea bag. I understand that any article found in it that are [sic] not mine can be held as evidence against me." The items found in this bag were, in my opinion, admissible because the search was predicated upon affirmative consent.

A similar situation obtains as to stolen articles found the next day in the trunk of the accused's own car. Before this search was made, the accused was advised of his rights under Article 31, and informed he did not have to consent to the search. It was also shown that in a statement dealing with some of the stolen property, the accused said, "I gave my consent to have my car, that is a 1953 Ford, which is parked on a parking lot off the May-Port Naval Station, searched. I understood that any items found that could be idinified [sic] as not being mine would be seased [sic] and held as evidence against me." At trial, the president of the special court-martial ruled that the "accused had consented to the search of this" car. There is ample evidence to support his ruling.

Much more might be said about my differences with the majority, but I have said enough to indicate why I cannot agree to their blanket condemnation of the police officers' conduct in this case.

I would answer the certified question in the negative, and I would return the record of trial to the board of review for further consideration.