UNITED STATES, Appellee

v

LANNY A. BURNSIDE, Airman Second Class, U. S. Air Force, Appellant

15 USCMA 326, 35 CMR 298

No. 18,235

April 23, 1965

*Major Robert S. Amery* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Major Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial at Larson Air Force Base, Washington, con- victed the accused of larceny of elec- trical cable from the Government, in violation of Article 121, Uniform Code

of Military Justice, 10 USC § 921, and sentenced him to a bad-conduct discharge and confinement at hard labor for six months. The case is before us on certification from The Judge Advocate General of the Air Force, and the petition of the accused to consider whether a confession admitted in evidence over the accused's objection was the product of an unlawful search of the backyard of the accused's house which led to discovery and seizure of the stolen cable. See United States v Davenport, 14 USCMA 152, 33 CMR 364.

At trial, the accused introduced a photograph of the cables taken at the place at which they were found, and made no objection to testimony by an agent of the Office of Special Investigations that the accused had admitted to him he took the cables from the Air Base.[1] Having gone so far, it is difficult to see what advantage the accused hoped to derive from a favorable ruling on his objection to the admission of the written statement. More importantly, while the agent who obtained the statement from the accused admitted he informed the accused that the cables were in possession of the OSI, there is no indication whatever of the effect the information had on the accused in inducing him to confess. The accused had been fully advised of his rights under Article 31 of the Uniform Code of Military Justice, 10 USC § 831, and had refused to say anything. Only after a second agent took over the examination, because the agent who first questioned the accused "wasn't getting anywhere," did the accused admit the theft. Since the defense objected merely to admission in evidence of the written statement, the law officer could have based his ruling on the ground that the chain of causation between the seizure of the stolen cable and the pretrial statement was so attenuated that the latter was not the product or the result of the former. Wong Sun v United States, 371 US 471, 9 L ed 2d 441, 83 S Ct 407 (1963); United States v Dutcher,

7 USCMA 439, 22 CMR 229, concurring opinion. That conclusion would make the legality *vel non* of the search and seizure immaterial, and leave no useful purpose to be served by consideration of the certified issue. See United States v Gilley, 14 USCMA 226, 34 CMR 6. However, some of the arguments of both counsel on the defense motion to suppress tend to indicate that the law officer may have based his ruling, not on attenuation of the nexus between the seizure and the confession, but on the legality of the search and seizure. If that was the basis of his decision, a justiciable issue exists.

We have consistently declined to allow a conviction to "rest upon uncertainty and confusion concerning the correct principles of law applicable to a vital part of the case." United States v Berry, 6 USCMA 609, 614, 20 CMR 325. As there is apparent uncertainty here, it is appropriate to review the legality of the search and seizure. We turn, therefore, to the facts pertinent to the issues.

On the morning of February 6, 1964, Staff Sergeant Merrill T. Hammett of the Contract Maintenance Office, Larson Air Force Base, discovered that three large electrical cables, each consisting of four strands of heavy copper wire, were missing from a trailer parked outside the warehouse. A search failed to uncover the cables. The next day, the matter was reported to the Air Police. Coincidentally, shortly before the report, Washington State Troopers, Sergeant Robert S. Grimstead and David F. York, chanced upon the accused at an abandoned garbage dump about four miles from the town of Moses Lake. The accused was standing at the rear of a 1951 Ford sedan which had its trunk lid raised; he had apparently just set fire to a large pile of material on the ground. The site was posted with a no-dumping sign. On approaching the accused, the officers noticed the rear seat and the back cushion of the automobile were missing. They called attention to the restriction against dumping, and asked the accused what

---

[1] In the written statement, the accused said he had removed the insulation from the cables, and sold the copper wire as scrap.

he was doing. He replied he had purchased copper wire as salvage from the Government, and he was burning the "remains." The officers asked the accused for identification. He said he had left his billfold at home and could not, therefore, produce his driver's license or the registration for the car, which bore Washington State license plates. However, he identified himself as "Lanny Burnside," and said he was in the Air Force. Satisfied with the explanation, the officers left the area to continue their patrol. On leaving, they noted the license number of the accused's car, and called the police station to verify the registration. Shortly thereafter, they were informed that the number was "registered to a 1958 Hillman station wagon." The officers immediately returned to the dump, but the accused was not there. They went to the Air Police office at the Air Base to determine more "about this situation." While at the office, the report came in about the theft of the electrical cable from the Contract Maintenance Office trailer.

Inquiry as to the accused's residence disclosed he had recently moved to a house in an area north of Moses Lake, which was known as Black's Addition. The house number was unknown. Edward M. Humphrey, a Deputy Sheriff of the county, who lived in Moses Lake and who had come into the Air Police office, was asked by the State Troopers to assist them "in finding a vehicle . . . bearing illegal plates." The Troopers, Sheriff Humphrey, and Air Policeman Sergeant Hooker, who "volunteered" to go along, proceeded to the accused's neighborhood.[2]

Both Grimstead and York testified they did not intend or expect to search the accused's premises. York described their purpose as follows: "The only thing we wanted to talk to

him about then was . . . the vehicle registration and about this matter of burning." Grimstead testified that they went to the accused's house "just" to talk to him about "the registration on the vehicle" and the reported theft of the cable.

After riding around the neighborhood for about fifteen minutes, the officers finally located the accused's house. It was then about 11:30 a.m. The residence was described as a two-family "duplex," which consisted of a building in which two residences shared a common party wall in the center. The accused's residence was on the left. The front door was located "pretty close" to the side of the house. There was a grassy areaway about fifteen feet wide between the duplex and the adjoining house. This areaway was partially covered with gravel, and "appeared as if it was used as a driveway." About twenty to thirty feet beyond the gravel part of the areaway, but on a direct line with it so that it appeared to be at the end of the driveway, was the front of an old, dilapidated building. At one time the structure had been either a garage or some kind of shed, but had been "made over" to what seemed to be two dwelling units, with separate entranceways. The door to one unit was open; the other was closed. There is no evidence as to who owned or rented this building. A motorcycle was in the driveway. A wooden picket fence ran from a point about three feet to the left of the accused's house to the right corner of the rear building. At the end nearest the street side, the fence turned toward the house. There was an opening in the fence of a kind provided for a gate, but there was no gate.

Sheriff Humphrey drove his vehicle onto the driveway; Trooper York parked in the street. The four officers walked to the front of the house.

<hr />

[2] Sergeant Hooker was not called as a witness by either side. Apparently, his role was that of a passive bystander. About the same time the Grimstead group went to the accused's house, agents of the Office of Special Investigations and Sergeant Hammett of the Contract Maintenance Office went to the dump area. There, they salvaged some material from the burning pile. In Hammett's opinion, this material was "like the cable insulation" on the missing electrical wire.

Sergeant Grimstead knocked a number of times on the front door, but received no response. Thereupon, Sheriff Humphrey asked an elderly woman, sitting on the stoop on the other half of the duplex, if she knew whether the accused lived in the house. She said she did not. Asked if there had been anyone there "recently," she answered in the affirmative, and said that a station wagon and an "older" car had just left. According to Sheriff Humphrey, the officers conferred and the "consensus of opinion" was that this was the residence of the accused. Humphrey noticed the old building at the end of the driveway.

The four officers walked up the driveway toward the building. Apparently they did so without agreement, and were differently motivated. Sheriff Humphrey testified that after they left the Air Base, Sergeant Grimstead told him of the encounter with the accused at the refuse dump, and the report of the theft of the cable. He "felt that this cable might possibly be in this building" because "probably a man wouldn't take the material in his house." Trooper York testified he went to the building in the rear "to determine if anybody was there or knew of the whereabouts of" the accused. Sergeant Grimstead said "it looked like somebody could have been living there," and he thought the accused could "have been living . . . in one of these apartments back there."

Arriving at the rear building, Sheriff Humphrey looked into the open door, but saw nothing. Sergeant Grimstead knocked on the closed door, but received no response. They all started back down the driveway to their cars. As they did so, Sheriff Humphrey looked over the fence into the backyard of the accused's residence. On the lawn next to the stoop at the rear entrance to the building, he saw a pile of material. The seat and seat back of an automobile were on the top of the pile; a tarpaulin was under these; and visible in a space between the edge of the tarpaulin and the grass was a black substance. Sheriff Humphrey pointed to the pile of material and called out that "possibly that was what we were looking for." He admitted he was not sure of the nature of the black material; he thought it was either a hose or cable. Sergeant Grimstead and Trooper York also looked at the pile. Trooper York testified that, "without a question in . . . [his] mind," he immediately recognized the black substance as electrical wiring cable with a covering of the "same dimensions and color" as the material he had seen the accused burning. Sergeant Grimstead testified there was no "question in . . . [his] mind" but that the material at the bottom of the pile was electrical cable "similar to the type . . . seen [earlier] at the dump area." After looking at the material from the driveway, the officers entered the backyard through the opening in the fence. Sheriff Humphrey went to the pile to life the tarpaulin for a closer look at the material. While he was thus engaged, Sergeant Grimstead knocked at the back door. Again, no one responded.

OSI agents were called to the site. Pictures were taken of the pile of material;[3] and the OSI took possession of the cable. On returning to the Air Base three days later, the accused was interrogated. He made a sworn confession, which was admitted in evidence over his objection that it was the product of an unlawful search and seizure.

Much of the accused's argument deals with whether the backyard of his residence, within the fence surrounding the dwelling, generally described as the curtilage (Webster's Third New International Dictionary, at page 558), is an area protected from unreasonable search by the Fourth Amendment. The Fourth Amendment to the Constitution protects the right of the people to be "secure in their persons, houses, papers, and effects"; it does not mention a curtilage or other open space around a building. See Marullo v United States, 328 F2d 361 (CA 5th Cir) (1964), rehearing

---

[3] One of these was introduced in evidence by the accused.

denied, 330 F2d 609 (CA 5th Cir) (1964); cf. Hester v United States, 265 US 57, 68 L ed 898, 44 S Ct 445 (1924). However, some cases hold that open areas adjacent, and functionally adjunct, to a dwelling are also privileged sanctuaries. See United States v Minker, 312 F2d 632 (CA 3d Cir) (1962), cert den, 372 US 953, 9 L ed 2d 978, 83 S Ct 952 (1963); People of State of California v Hurst, 325 F2d 891 (CA 9th Cir) (1963); Work v United States, 243 F2d 660 (CA DC Cir) (1957); Hobson v United States, 226 F2d 890 (CA 8th Cir) (1955). Putting aside reconciliation of the rule that a civil trespass does not violate the Fourth Amendment, as held by the Supreme Court of the United States in the *Hester* case, supra, with the doctrine of the inviolability of the open space of a curtilage as applied, for example, in the *Work* case, supra, and Brock v United States, 223 F2d 681 (CA 5th Cir) (1955), in its broadest applications the curtilage theory still avails the accused nothing in this case.

It is not illegal, or even a civil trespass, for police officers to enter upon the premises of an individual, at a suitable hour, for the purpose of making a genuine inquiry into a police matter. As the Court of Appeals for the Third Circuit said in United States v Horton, 328 F2d 132, 136 (1964), there is no constitutional or judicial "policy against official visitation for purposes of inquiry not attended by search." The Court saw "no reason" to discourage policemen from seeking access to a private residence "to make proper inquiries, whether concerning suspected wrongdoing or for other official business." In Ellison v United States, 206 F2d 476, 478 (1953), the Court of Appeals for the District of Columbia held that officers desiring to arrest a subject were "perfectly entitled to go to . . . [his] door, ring the bell, and inquire as to his whereabouts." In Davis v United States, 327 F2d 301, 303 (1964), the Court of Appeals for the Ninth Circuit referred to the police officers' right of entry upon private premises for the purpose of legitimate inquiry, as follows:

"Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law."

When there is no response to the knock or the bell at the front door, it is not illegal or unreasonable for the police officers to go to the rear door by an obvious passageway, open for the "use of tradesmen and other persons having legitimate business," to attempt to arouse the occupants and "carry out their mission." United States v Polk, 201 F Supp 555, 558 (ND Cal) (1961), affirmed, 314 F2d 837 (CA 9th Cir) (1963); United States v Myers, 219 F Supp 908 (ED Pa) (1963), affirmed, 329 F2d 280 (CA 3d Cir) (1964). The officers here did not go that far before they saw the property eventually seized; but from any standpoint their entry did not violate the Fourth Amendment.

Judged by the testimony of Troopers Grimstead and York, the entry upon the driveway was lawful, because to them the driveway was merely an open passageway to another habitation; and their sole purpose was to locate the accused for questioning. Tested by the testimony of Sheriff Humphrey, who thought the structure was merely a "shed," the entry did not violate the accused's right under the Fourth Amendment, because the driveway was outside the privileged area. At trial, defense counsel did not contend the driveway was within the curtilage of the accused's dwelling; and in this Court, several cases cited in the defense brief in support of the petition expressly note that "the special protection accorded by the Fourth

**331**

Amendment [does not] extend to the open driveways" alongside a dwelling. United States v Rogato, 39 F2d 171, 175 (MD Pa) (1930). Whether we need go that far doesn't concern us. The driveway was situated between two houses. It ended at the entrance to another structure which apparently contained two dwelling units. There is no evidence that this building belonged to, or was rented by, the accused. The areaway was separated by a fence from the space adjacent to the accused's house. It is reasonably inferable from the evidence, and the law officer could have found, that the driveway was a passageway outside the curtilage of the accused's dwelling. United States v Minker, supra; United States v Sorce, 325 F2d 84 (CA 7th Cir) (1963), cert den, 376 US 931, 11 L ed 2d 651, 84 S Ct 701 (1964).

When police officers are at a place rightfully, they are not required to close their eyes to their surroundings. In the *Ellison* case, supra, at page 478, the Court of Appeals observed that when police officers are legitimately on private premises they are not "guilty of any impropriety in allowing their eyes to wander." See also United States v Myers, supra; United States v Barone, 330 F2d 543 (CA 2d Cir) (1964), cert den, 377 US 1004, 12 L ed 2d 1053, 84 S Ct 1940 (1964). Consequently, it was neither illegal nor improper for the officers to look past the fence into the accused's backyard at the pile of electrical cable. Appellate defense counsel, however, contend that even if discovery of the cable was legal, the seizure without a warrant violated the Fourth Amendment.

Search and seizure are separate acts. Each must satisfy the constitutional requirement of reasonableness. A search can be legal, yet the resultant seizure of property or papers discovered in the course thereof may be illegal. For example, the seizure of the entire contents of a home is improper, Kremen v United States, 353 US 346, 1 L ed 2d 876, 77 S Ct 828 (1957); or the property seized may

not be of a kind subject to seizure. United States v Vierra, 14 USCMA 48, 33 CMR 260; cf. United States v Simpson, 15 USCMA 18, 21, 34 CMR 464. The question, then, is whether the Constitution commands a police officer, seeing immediately before him the fruits of a reported crime, to leave such fruits where they are in order to get a warrant to authorize the seizure. Appellate defense counsel say the Fourth Amendment requires that course of action. The only case cited to us is United States v Scott, 149 F Supp 837, 842 (DC DC) (1957). There, the District Court held the police officers had properly entered the accused's apartment to effect his arrest, but could not seize property which appeared to be part of the fruits of the crime. The theory of the District Judge was that there was no "emergency" to justify the seizure; in his view, some of the police officers should have stationed themselves at the apartment, while others obtained a warrant for the seizure. With all due respect to the experience and learning of the trial court, the decision in *Scott*, supra, is predicated upon a doctrine rejected by the Supreme Court of the United States. In United States v Rabinowitz, 339 US 56, 65, 66, 94 L ed 653, 70 S Ct 430 (1950), the Court said:

"It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. . . . The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of

privacy within the broad sweep of the Fourth Amendment."

Federal appellate courts have consistently held that police officers properly on private premises ▪ do not violate the Fourth Amendment if, without a warrant, they seize contraband, or the fruits of a crime which are in plain view. In Davis v United States, supra, the court sustained the seizure of marihuana observed by police officers in a wastebasket *inside* the accused's house, to which they had been properly admitted. In the *Barone* case, supra, the court sustained the seizure of torn counterfeit bills seen by police officers inside an apartment to which they had been legitimately admitted. In United States v Myers, supra, at page 911, the court said police officers who went to the defendant's premises to inquire about a theft could "seize fruits of a crime lying about in the open."

One matter remains for consideration. Sheriff Humphrey testified he was uncertain about the nature of the material at the bottom of the pile. He, therefore, could not properly have entered the accused's backyard. However, before Sheriff Humphrey entered the yard, Sergeant Grimstead and Trooper York had recognized the material as electrical cable, and were certain it fitted the description of the stolen property. This antecedent identification distinguishes their seizure from that in Hobson v United States, supra, so strongly relied upon by appellate defense counsel. In *Hobson*, aside from expressing doubt as to the legitimacy of the officers' purpose in entering upon the premises, the court held specifically "the break-in occurred *before the officers had knowledge of the contents of the package*" which was seized by them (226 F2d, at page 892). (Emphasis supplied.) For the same reason, People of State of California v Hurst, supra, is distinguishable. Cf. United States v Conlon, 14 USCMA 84, 33 CMR 296.

We answer in the affirmative the certified question which asks whether the board of review was correct in holding the seizure was legal; and we affirm the decision of the board of review.

Judges FERGUSON and KILDAY concur.