UNITED STATES, Appellee

v

DOUGLAS HOLLY, Private, U. S. Army, Appellant

18 USCMA 413, 40 CMR 125

No. 21,582

July 3, 1969

*Captain Karl J. Uebel* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent, Major John Wall Hanft,* and *Captain Douglas J. Wold.*

*Major William A. Pope, II,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major Edwin P. Wasinger.*

## Opinion of the Court

FERGUSON, Judge:

The accused was convicted by general court-martial of assault with a knife, thereby inflicting grievous bodily harm, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. His sentence, as the case reaches this Court, extends to a dishonorable discharge, confinement at hard labor for two years, and forfeiture of $40.00 per month for a like period. We granted review on four assignments of error.

The incident which gave rise to the charged offense occurred in a bar in Germany where a number of soldiers were spending All Hallows Eve. A sergeant entered and threatened to hit the barmaid with a rock he was carrying. He was restrained and disarmed by the victim, the barmaid's former paramour. Another sergeant separated these two men, whereupon the accused approached and inquired of the peacemaker-sergeant as to what was going on. The victim replied that it was none of his business and an argument ensued. Suddenly the victim lunged and grabbed the accused. The peacemaker again had to separate the combatants. As he did so, he saw blood on the shirt of the victim. No one saw the accused use a knife. Although the aforementioned barmaid testified that she called out to her former boyfriend, "Will, watch out, I think he gots [sic] a knife," she did not see one. The victim himself was unclear as to the events. After relating the events which led to his interceding on behalf of the barmaid, he testified:

". . . From that time on, my mind is a blank. The next thing I remember from there, me and Holly was arguing about what, I cannot say. I can't say what we were arguing about. All I know is, the next thing I remember after that is, I was standing over by the latrine door, taking my T-shirt off, looking at my stab wound.

"But from the time I went over there to the stabbing, all this is a blank. I know Holly stabbed me, but I can't give you any logical reason as to how I know. I mean—I could not identify the knife. I don't even remember seeing a knife, but I know he stabbed me. But if you asked me why, I couldn't tell you. I couldn't tell you a logical reason as to how I know."

According to the victim, he and the accused are acquainted, have had drinks together and, in fact, met while dating the same girl. There have never been any harsh words between them, there is no jealousy and, on one occasion, when the victim was being bested in a fight over a girl, the accused pulled his assailant off and kept the latter's friends from joining the affray. He admitted that it was possible he grabbed the accused and provoked him but he

414

could not actually remember the course of events.

The defense attempted to show by cross-examination of a prosecution witness, who admitted being present and having an open-bladed knife in his hand at the time of the altercation between the victim and the accused, that someone other than the accused may have inflicted the victim's wound. This witness, according to the barmaid, urged the sergeant to hit her with the rock.

Direct defense evidence reflected that the accused had difficulty in walking and maintaining his balance due to a service-connected injury to his knee. He usually walks with a cane and has to wear a leg brace. His separation from the service because of the permanent nature of the injury has been recommended. Accused didn't have his cane in his hand at the time of the altercation. After the victim lunged at the accused, they wrestled together. According to the sergeant who separated them, "There wasn't no hitting or cutting or what not. They was wrestling with each other; their hands was being held by each other's clothes." The bar was well patronized at the time and people were crowded around the combatants. A switchblade pocket knife, with a three-inch blade (Prosecution Exhibit 1) was taken from the accused three days later. No traces of blood were found on it.

At an out-of-court hearing on the instructions, defense counsel, in reply to an inquiry of the law officer, stated that the defense theory of the case was twofold: First, that the accused did not inflict the injury on the victim; and, secondly, since it was conceivable the court might find that the accused did inflict the injury, then, in such an event, he was, in view of his disability, acting in self-defense to an attack by the victim.

The law officer refused to give an instruction on self-defense since he did not believe that the evidence raised the issue. However, he refused trial counsel's request to strike the testimony with reference to the accused's disability on the ground that, lacking an issue of self-defense, this testimony was irrelevant.

In his instructions to the court, the law officer made the following two observations, both of which are assigned as error:

1. "The court is advised that the injury sustained by Robert L. Williams, Jr. [the victim], amounted in law to grievous bodily harm."

2. "Based on the evidence and pleadings of this case there was no justification or excuse for the assault on Robert L. Williams, Jr. [the victim], therefore, I will not define those legal concepts."

The extent of the victim's injury was presented to the court by way of stipulated medical testimony. There it was reported that:

"I saw Private (E–2) Robert L. Williams, Jr. at approximately 2400 hours 31 October 1967 after he was admitted to the U. S. Army General Hospital at Landstuhl, Federal Republic of Germany. PVT Williams had a two inch cut in the left upper quadrant or abdomen through which approximately two feet of his small intestine was protruding. There was one small penetrating through-and-through wound in the small intestine within the abdomen and another small wound that was partially penetrating through the serosa or covering membrane of the small intestine only. The remainder of the abdominal exploration was within normal limits.

. . . . . . .

"PVT Williams was in good condition upon arrival at the hospital and was never in critical condition. The primary danger from the type of injury PVT Williams suffered is bleeding to death or peritonitis and there is little chance of these consequences, as was the case with PVT Williams, so long as the patient is treated within 12 to 14 hours. It is likely that with a penetration of the abdomen such as PVT Williams suffered, running would cause more protrusion of the intestine because of the outward pressure which is

exerted by the stomach muscles. Following his admission to the hospital, PVT Williams' intestine was sutured; an incision made in his abdomen; the intestine returned through the wound; the wound closed from the inside and the midline incision sutured."

In United States v Leech, 18 USCMA 129, 39 CMR 129, this Court had occasion to examine the correctness of the law officer's instruction that the injury sustained in that case amounted in law to grievous bodily harm. We held it to be erroneous and reversed, saying, at page 130:

". . . On this subject, we are satisfied that, given the choice, reasonable men might well have differed on the degree of the seriousness present in the victim's injury. It was, therefore, a point that should have been presented to the court for their determination. Any instruction to the contrary is necessarily prejudicial for the accused is entitled to have correct instructions given the court by the law officer on each element of the offense charged. United States v Walters, 10 USCMA 598, 28 CMR 164; United States v Clay, 1 USCMA 74, 1 CMR 74. The right is not waived by trial defense counsel's failure to interpose an objection. United States v Gilbert, 16 USCMA 446, 37 CMR 66."

The decision in *Leech* is controlling here.

In *Leech*, we directed that the board of review may affirm a lesser included offense that was instructed upon and reassess the sentence or order a rehearing on the original charge. In this case, however, since there are other errors in the record directly affecting possible lesser included offenses, it is incumbent upon us to order a rehearing. Cf. United States v Patterson, 14 USCMA 441, 34 CMR 221.

Since a rehearing is in order, we must consider the other alleged errors which might arise thereat.

416

The accused defended on the ground that he was initially attacked by Williams and was responding ▮▮▮▮ thereto. When the law officer told the court there was *no justification or excuse for the assault on Williams*, he, as a matter of law, rejected the accused's defense and thereby foreclosed the court from consideration of this factual issue. This was error. Roe v United States, 287 F2d 435 (CA 5th Cir) (1961). As the court in *Roe* stated at page 440:

". . . [N]o fact, not even an undisputed fact, may be determined by the Judge. The plea of not guilty puts all in issue, even the most patent truths. In our federal system, the Trial Court may never instruct a verdict either in whole or in part."

It cannot be asserted that the issue was not in evidence, for the sergeant, who separated the victim and the accused, testified that after the accused had inquired as to what was going on, "All of a sudden, Robert Williams lunged over and grabbed Private Holly and they tussled a while, just like a flash. I rushed between them and pulled them apart."

In United States v Roberson, 12 USCMA 719, 722, 31 CMR 305, we adopted the following quotation from Perez v United States, 297 F2d 12, 15 (CA 5th Cir) (1961):

" 'It is elementary law that the defendant in a criminal case is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence. Tatum v United States, 190 F2d 612 (DC Cir 1951). A charge is erroneous which ignores a claimed defense with such a foundation. Hyde v United States, 15 F 2d 816 (4th Cir 1926).' "

For further citations on the need for appropriate instructions see Tedrow, Digest, Annotated and Digested Opinions, U.S. Court of Military Appeals, Instructions, Issues, page 515, *et seq.*

Not only did the law officer ignore the claimed defense which had a foundation in the record, but he spe-

cifically informed the court that it was not available to the accused. His instruction was obviously directed toward his prior denial of a requested instruction on self-defense for, as he then informed defense counsel, "The evidence is of a mutual lunge." It would appear that he may have believed the accused resorted to inordinate force in his encounter with the victim, because he also told counsel, "There is no evidence of fear or anything else, that he was to be injured." But that is not the only test to be applied where self-defense is concerned. As we said in United States v Gordon, 14 USCMA 314, 321, 34 CMR 94:

> "Obviously, we do not hold that, as a matter of law, the killing was in self-defense. That is not the test for determining whether an issue is reasonably raised. The burden of proof beyond reasonable doubt is on the Government, and if there is in the record evidence which, if credited, could raise a reasonable doubt whether the accused acted in self-defense, then the law officer is obligated to appropriately frame that issue and submit it for resolution to the triers of fact."

Once the issue is raised, as here, there is a concomitant requirement for full and complete instructions, tailored to the evidence of record, including the use of a knife to parry a simple assault. See cases collated in *Gordon*, at pages 320 and 321. See also United States v Vaughn, 15 USCMA 622, 36 CMR 120. The court members do not have to believe the defense evidence, but that decision is theirs alone. The law officer may not take it from them. As stated in Young v United States, 309 F2d 662 (CA DC Cir) (1962):

> ". . . However implausible, unreliable or incredible only the jury had the right to make the evaluation of . . . [the witness'] testimony. The evidence of a simple assault cannot be regarded as strong or convincing and perhaps the source could well be regarded as of dubious reliability, but the question of its

weight and credibility was for the jury. . . . The ruling denying the lesser included offense instruction necessarily involved an appraisal of that evidence and . . . [the witness'] credibility by the District Judge but the trier cannot withdraw that appraisal from the jury. Kinard v United States, 68 App DC 250, 96 F2d 522 (1938). See also Stevenson v United States, 162 US 313, 323, 16 S Ct 839, 40 L Ed 980 (1896)."

See also United States v Bellamy, 15 USCMA 617, 621, 36 CMR 115, wherein we quoted at length from Stevenson v United States, 162 US 313, 40 L Ed 980, 16 S Ct 839 (1896).

The third issue, on which we granted review, concerns the reception in evidence of the pocketknife obtained from the accused. Since my brothers disagree with me on this issue, I record my separate views.

In an out-of-court hearing, the accused's commanding officer related that three days after the alleged offense he was telephonically informed by a member of the Criminal Investigations Detachment that the accused was under investigation for the charged offense. He was told "to make sure Holly was still around and to go through his possessions and see if I could find a switchblade knife that was used in the assault—that he could have used." The investigator also told the commanding officer that "he had talked to the individual that was stabbed and the individual told him at that time that it was Holly that did it." When he found the accused in the billets, the latter was sitting on a bed trimming his fingernails with a knife. As he entered, the accused folded the knife and put it in his pocket. He was directed to come to the orderly room. At the same time, the commanding officer inquired as to what the accused was playing with. "He said 'a knife' and I told him to let me see it, and I saw at that time it was a switchblade and I told him I'd give him a hand receipt for the knife, that I'd have to retain it in the battery safe or the arms room, where the rest of these

items are, sensitive items." He gave Holly a receipt for the knife and gave the knife to the Lieutenant in charge of the S2 section.

The commanding officer asserted that he had no idea whether the knife was the one utilized in the assault; he did not observe, nor could he tell, that it was a switchblade knife prior to receiving it from the accused; he did not take it pursuant to the request to search the accused and his possessions, as he did not intend to make a search at that time; he asked for the knife because he was curious; he answered in the negative when asked whether he took the knife because the blade appeared to be longer than regulations allow.

Defense counsel's motion to exclude the knife and the testimony of the commanding officer on the grounds of illegal search and seizure was denied by the law officer. He admitted the knife into evidence with the comment that "it has not yet been connected at this time with the crime."

At this level, appellate defense counsel asserted that based on the testimony of the commanding officer the seizure of the knife was unreasonable since, allegedly, he did not have probable cause to believe that possession of the knife was *per se* illegal (prohibited weapon) or that the knife was the weapon used in the alleged offense. They also urge its inadmissibility because it was irrelevant, not having been authenticated as the knife used in the instant offense.

The Government contended that the commanding officer not only had probable cause to seize the knife, on the basis of the information supplied to him, but also he was empowered to do so by reason of his administrative responsibility to preserve the safety and integrity of his command by enforcing military regulations, in this case those prohibiting possession of certain categories of weapons. As to the relevancy of this evidence, the Government, in its brief stated the following:

"... Although, *the knife was not admissible as the instrumentality of the crime,* its admission was relevant to the prosecution's theory that the appellant had the means, as well as the sole opportunity, to stab the victim on the night in question." [Emphasis supplied.]

The law officer, in his instructions, called the court's attention to the fact that the knife had been admitted in evidence for a limited purpose. As he explained,

"... The evidence was allowed in solely to help you determine whether or not there was a knife in the hand of the accused on that evening, at the time the stabbing took place."

He also cautioned the court on the inferences they could *not* draw from this evidence and, in this regard, I believe he properly tailored the evidence to the law of the case. United States v Smith, 13 USCMA 471, 33 CMR 3. For this he is to be commended. I believe, however, that he erred initially in admitting the knife into evidence. In his ruling on the motion the law officer acknowledged this possibility when he told counsel that, "If the law officer made a mistake, the appellate court will pick it up."

I have closely examined the testimony of the commanding officer and conclude that it offers no legal basis to support the admissibility of this evidence. The latter's testimony is in part quoted and in part summarized above and need not be restated. Suffice to say, he affirmatively declined to attribute a legal reason to his action and quite candidly admitted that his sole basis for asking to see the knife was that he "was curious."

The facts in this case are not unlike those found in United States v Thomas, 16 USCMA 306, 36 CMR 462, in which a bottle, later found to contain heroin, was taken from the hand of the sleeping defendant. As we said in *Thomas,* at page 308:

"In our opinion, the law officer clearly erred in receiving the bottle and its contents in evidence, based

on nothing more than the allegation that the accused was found asleep with it in his hand. True it is that there was no search here, for the bottle was plainly exposed to open view. United States v Morse, 9 USCMA 799, 27 CMR 67; United States v Burnside, 15 USCMA 326, 35 CMR 298. But, as was stated in the latter case, at page 332:

'Search and seizure are separate acts. Each must satisfy the constitutional requirement of reasonableness. A search can be legal, yet the resultant seizure of property or papers discovered in the course thereof may be illegal.'

"It is with the seizure of the bottle that we are here concerned, and not with any antecedent search. The Government urges that such was reasonable under the circumstances, but we must disagree. Whether a seizure is reasonable depends upon the existence of probable cause for that action. United States v Brown, 10 USCMA 482, 28 CMR 48; United States v Battista, 14 USCMA 70, 33 CMR 282; United States v Davenport, 14 USCMA 152, 23 CMR 364; United States v Burnside, supra. There must be facts and circumstances from which the probability of the item's contraband nature may be inferred— 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v United States, 338 US 160, 175, 93 L Ed 1879, 69 S Ct 1302 (1949). There is simply no basis shown on this record for any conclusion by Sergeant Lively that the seized bottle contained narcotics, or that accused was under its influence. Indeed, he did not even testify he suspected such to be the case. Compare Hobson v United States, 226 F2d 890 (CA 8th Cir) (1955).

"All that was shown on this record was a sleeping accused holding a medicine bottle in his hand. Such facts, standing alone, import no suspicion of wrongdoing or possession of contraband. They are meaningless as a legal foundation for the bottle's seizure. If more information was available to indicate the existence of the requisite basis for the sergeant's action, it was the duty of the Government to adduce it. United States v Dollison, 15 USCMA 595, 36 CMR 93; United States v Herberg, 15 USCMA 247, 35 CMR 219; United States v Westmore, 14 USCMA 474, 34 CMR 254. This was not done here, and we can perceive no grounds in this record for the seizure."

In the case at bar, the knife was visible to the commanding officer when he entered the room. However, mere possession of a knife is not proscribed by regulations. Accused's possession of a knife, therefore, standing alone, imparted no suspicion of wrongdoing. The accused's compliance with the commanding officer's *request* to see the knife was, under these circumstances, a forced disclosure and in violation of his right to privacy under the Fourth Amendment to the Constitution. Hobson v United States, 226 F2d 890 (CA 8th Cir) (1955), and cases cited therein. Absent a showing or, at the very least, an affirmative declaration that, in requesting to see the knife, he was acting in support of pertinent military regulations or in furtherance of the investigation then underway, I must conclude that the evidence obtained thereby was inadmissible. United States v Thomas, supra.

The fourth assignment of error which alleges that the staff judge advocate failed, to the prejudice of the accused, by not advising the convening authority of the effect of section 804 of Title 37, United States Code, as it relates to receipt of pay by a serviceman who has been sentenced to a dishonorable discharge and confinement at hard labor, is controlled by our decision in United States v Bolden, 18 USCMA 119, 39 CMR 119. As in that case no error is perceived here.

In sum then, the majority of this Court hold that the law officer erred: (1) When he instructed the court that the injury sustained by the victim amounted to grievous bodily harm as a matter of law; and (2) when he told the court that based on the evidence

and the pleadings of the case there was no justification or excuse for the assault on the victim. I also believe that he erred when he admitted into evidence the knife obtained from the accused by the commanding officer.

The decision of the board of review is reversed. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

DARDEN, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

Disagreement with the view on the issue of probable cause for the seizure of the knife precludes my outright concurrence.

QUINN, Chief Judge (dissenting):

I join Judge Darden in his exception to the principal opinion. As to the two particulars on which he agrees with Judge Ferguson for reversal, I am constrained to register my dissent.

While the doctrine of self-defense does not limit the individual to the exercise of exactly the same kind of force as is used against him by an assailant, recourse to a deadly weapon in resisting an assault made without a deadly weapon is excusable only if it appears to be reasonably necessary to prevent death or grievous bodily harm. United States v Regalado, 13 USCMA 480, 33 CMR 12; United States v Gordon, 14 USCMA 314, 34 CMR 94. Several witnesses testified about the stabbing. The testimony of only one bears upon the question of self-defense. He stated that the accused and the victim "tussled" for only "a flash" and he then parted them. The witness admitted that the victim was merely "holding" the accused's "clothing." The accused was not thrown off balance either by the assault or because of his bad knee, and it may fairly be inferred that he was not even struck in the face or body by the victim. There is also testimony indicating that the accused left at a "fast pace" immediately after he and the victim were physically separated. In my opinion, there is not a scintilla of evidence to suggest a reasonable ground for apprehension of death or grievous bodily harm and there is not a word of testimony to indicate that the accused believed recourse to a deadly weapon was necessary to protect himself against serious harm. Self-defense, therefore, was not placed in issue by the evidence. United States v Straub, 12 USCMA 156, 30 CMR 156.

As to the instructions on the nature of the injury inflicted upon the victim, United States v Leech, 18 USCMA 129, 130, 39 CMR 129, held only that a " 'fragmented fracture of the distal end' " of the humerus was the kind of injury as to which reasonable men might differ "on the degree of . . . seriousness." A chipped elbow is a far different injury from the kind of injury the victim suffered in this case. The stab wound penetrated his stomach and exposed his small intestine; by the time he received medical attention, two feet of the intestine protruded from the wound. The victim was hospitalized for fourteen days and at the time of trial, which was more than two months after the stabbing, the wound was "still healing." Under the circumstances, I see no prejudice in the law officer's advice to the court members that the wound was sufficient in law to constitute grievous bodily harm. United States v Dejewski, 3 USCMA 53, 11 CMR 53; State v Damuth, 135 Minn 76, 160 NW 196 (1916); Jackson v State, 100 Tex Crim 572, 272 SW 179 (1925). I would, therefore, affirm the decision of the board of review.