UNITED STATES, Appellee

v

JUAN A. CASTRO, Specialist Four, U. S. Army, Appellant

*Major Franklin D. Arness* argued the cause for Appellant, Accused. With him on the brief was *Colonel Arnold I. Melnick.*

*Lieutenant Colonel Ronald M. Holdaway* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Donald W. Hansen, Captain M. Douglas Deitchler, and Captain David A. Schlueter.*

## OPINION OF THE COURT

FERGUSON, Senior Judge:

We granted review to consider whether the accused was prejudiced by the trial judge's denial of a defense motion to suppress evidence allegedly derived from an illegal search.

On the morning of June 14, 1972, prohibited drugs were found in the possession of Specialist Stewart. He was interrogated by Agent Freeman of the Criminal Investigation Detachment and indicated that he had bought the drugs "[t]hat same day" from the accused. Stewart had paid the accused the previous day and one of the bills he gave in payment bore the number 4 written on it with a red felt pen. Directly after obtaining Stewart's statement Agent Freeman "acted" to preserve the evidence. He and another agent agreed on a "plan of action" which involved "contact-[ing] Castro, apprehend[ing] him, and bring[ing] him to the office for questioning." Later, Freeman and Agent Askew met the accused at the motor pool, and Freeman "placed him under apprehension." However, Freeman's and the accused's account of the circumstances of the encounter indicate Freeman did not take the accused into custody because he had probably committed a crime. See Manual for Courts-Martial, United States, 1969 (Rev), paragraphs 18 and 19.

According to the accused, when Freeman came to the motor pool he said:

" 'Castro, we want to question you.' " he was taken to the CID office. Freeman admitted he did not advise the accused of any charge against him; instead, he told him "we wished to question him at my office, and I requested that he accompany us." He admitted he intended only "to question" the accused and to look for the "marked bill" described by Stewart. In response to a question by trial counsel as to whether he "went to the accused and arrested him for the purpose of preserving the evidence," he answered, "That's correct."

Arriving at the CID office, Freeman advised the accused that he was "suspected" of wrongful sale of dangerous drugs. He informed him of his right to remain silent and his right to counsel, and the accused indicated he did not wish to exercise either of these rights. Freeman then "proceeded" to inform the accused "of the accusations" made by Stewart and advised that he "wanted to search" him for the marked money. The accused denied the alleged sale and that he had any marked money. Thereupon, Freeman requested the accused's consent to a search of his person for the money. He gave the accused a form of consent to search and asked him to read it. When the accused had done so and acknowledged that he understood it, Freeman asked him if he "understood we could not search him against his counsel."[1] The accused replied in the affirmative. Freeman then asked the accused "if he

---

[1] Later in his testimony, Freeman stated that he intended to search the accused, with or without his consent, "by whatever means . . . necessary," but his intention "definitely was not conveyed" to the accused.

would give us consent to search him looking for that specific item," and he also explained that items of evidence which the accused "was not entitled to be in possession of," such as drugs and contraband, "would be seized." The accused agreed to be searched and signed the form. In his testimony, the accused acknowledged he agreed to the search of his person, but he insisted he "understood . . . [he was] consenting" only to a search for marked money. "When they said I had marked money on me," he testified, "I knew I was innocent and whatever they had on me was not right."

His consent given and the consent form signed by him, the accused was instructed to empty his pockets onto Freeman's desk. He removed various articles, including his wallet and a notebook. The wallet was "examined very closely," but the marked bill was not found. The notebook was then examined. In his account of what next occurred, the accused testified that he thought at first "they were looking for money through the book," but when it became apparent they were interested in a list of names and numbers in it, he asked for its return; they refused, saying they "were going to use it as evidence against" him. Freeman testified he "examined" the notebook and showed the list of names to Agent Askew and commented to the accused that he "felt that was a list of drug sales." Although Freeman denied the accused had asked for return of the book, he admitted that after he showed the list of names in it to Agent Askew, he "confiscated" it, despite accused's insistence that the list was of loans he had made.

Two of the names on the list in the book were Stewart and "Moose," the nickname of another soldier whom Stewart had identified in his statement as having bought drugs from the accused. The other names were unknown to Freeman. He conceded that the notebook "prompted" numerous interviews of the "personnel listed in" it and these were "essentially" the witnesses against the accused.

■ Consent to a search obviates the necessity for a warrant; for the existence of probable cause to believe that crimi-

nal evidence will be found; or for any other basis of justification for Government intrusion into the privacy of the individual's person and effects. Consent is not irrevocable; it can be withdrawn for any reason, even while a search under it is in progress. From the moment of withdrawal of consent, the search must cease. United States v Cady, 22 USCMA 408, 47 CMR 345 (1973). Moreover, consent can be granted on terms that restrict the search as to both place and property. Id.

■ The form of consent signed by the accused purported to authorize Agents Freeman and Askew to take "any . . . papers . . . or other property which they may desire" from the accused, provided they furnished him with a receipt. However, it is clear that the agents did not seek unlimited consent to search and the accused did not grant unqualified consent. As Freeman testified, the search was to be only "for the evidence [he] described," and that evidence was only the marked money allegedly given to the accused by Stewart. He expressly told the accused "they would be looking for that specific item," but he also explained that if "items of evidence" which the accused "was not entitled to be in the possession of," such as drugs and contraband were found in the course of the search, they "would be seized." In its most expansive sense, therefore, the accused consented to be searched only for marked money, with the understanding that, if in the course of that limited search contraband was discovered, it could be seized. See United States v Burnside, 15 USCMA 326, 35 CMR 298 (1965); United States v Summers, 13 USCMA 573, 33 CMR 105 (1963).

■ Turning to Freeman's examination of the pages of the notebook, we are satisfied that inspection to determine whether the money was hidden among its pages was within the terms of the accused's consent. Defense counsel acknowledged the point in his argument on the motion to suppress. But, he also contended, and we agree, that Freeman was not authorized by the terms of accused's consent to confiscate the notebook.

The notebook was not an article of

contraband. Nor does it appear from Freeman's testimony that the names and numbers on the list were apparent to him as he leafed through the pages in search for the marked money. *Cf.* United States v Hendrix, 21 USCMA 412, 45 CMR 186, 194 (1972) (Quinn, J., dissenting). On the contrary, the inference is that he learned the details of the list only from scrutiny of it. United States v Hendrix, 21 USCMA at 417–8, 45 CMR at 191–2. See also United States v Mc-Crary, 18 USCMA 104, 39 CMR 104 (1969). Nor does Freeman's testimony demonstrate a rational connection between the list and the alleged drug transaction between Stewart and the accused. For example, there is no evidence that the amount of money listed alongside Stewart's name corresponded to the amount he allegedly paid the accused the previous day. The absence of evidence of a connection between the notebook and the Stewart drug purchase distinguishes this case from Bretti v Wainwright, 439 F2d 1042 (5th Cir 1971), which is heavily relied upon by the Government. There, the court held that the Government did not abuse the terms of accused's consent "[s]ince there is a nexus between the crime for which the evidence was sought and the driver's license that was seized." *Id.* at 1046.

■ In a fallback position, appellate government counsel contend, as did trial counsel at trial, that the search of the accused was incident to his apprehension, and, therefore, the notebook could be seized as evidence of a probable crime. See Gustafson v Florida, 414 US 260 (1973); United States v Robinson, 414 US 218 (1973). Freeman's testimony does not support a conclusion that he apprehended the accused because he had probable cause to believe that the accused had committed a crime. See MCM, paragraph 19*d*. Had he apprehended the accused on that basis, it seems inconceivable that he would release the accused, as he did, immediately after he seized the notebook.[2]

Despite Freeman's testimony and trial counsel's argument, the trial judge expressly noted in his ruling on the defense motion to suppress that he did not regard the search as made "pursuant to an arrest." Consequently, whatever the nature of the restriction imposed by Freeman upon the accused's freedom of movement, it was not the kind that authorized full-scale search of the accused's person and effects and the seizure of the notebook within the rule of a search incident to arrest as discussed by the Supreme Court in the *Robinson* and *Gustafson* cases.

■ As the notebook was seized illegally, it was inadmissible in evidence against the accused. Equally inadmissible was evidence derived from exploitation of the notebook. Wong Sun v United States, 371 US 471 (1963); United States v Crow, 19 USCMA 384, 387, 41 CMR 384, 387 (1970). The taint of an illegal search can extend to the testimony of a witness discovered by exploitation of evidence obtained in the illegal search. United States v Armstrong, 22 USCMA 438, 47 CMR 479 (1973). According to Freeman's testimony, the identity of substantially all the witnesses against the accused was learned from the notebook. The testimony of those witnesses was, therefore, tainted and inadmissible against the accused.

Appellate defense counsel contend there is no substitute evidence available to the Government, and the charges should, therefore, be dismissed. See United States v Vasquez, 22 USCMA 492, 47 CMR 793 (1973). While Agent Freeman admitted that the notebook "prompted" interviews with persons who became witnesses for the Government, he also indicated that accused had been under investigation before the Stewart transaction and that the CID had "indications" of other drug sales by the accused. Freeman refused to say that the witnesses would not have "eventually been interviewed," independent of the

[2] The only direct reference to accused's release from custody "immediately after" examination of the notebook appears in the memorandum of law submitted to the trial judge by defense counsel in connection with the motion to suppress. The point was not disputed by trial counsel but, more importantly, the fact of release appears as a reasonable inference from the testimony of both Freeman and the accused.

impetus provided by the notebook. We cannot say with assurance, therefore, that the Government does not have independent evidence of the existence of the witnesses. It is entitled to the opportunity to demonstrate that it has such independent sources.

The decision of the Court of Military Review is reversed, and the findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge QUINN concurs.

DUNCAN, Chief Judge (dissenting):

Regretfully, I must disagree with my brethren concerning the legality of the search and seizure in this case. In my opinion, the seizure of the notebook may be justified on two bases. First, it was an obvious record of the accused's drug transactions and thus seizable as an item of evidence that the agents came across during the course of a lawful consensual search. Secondly, the notebook was also, for the same reason, subject to confiscation during a search incident to a lawful arrest, notwithstanding the military judge's conclusion to the contrary.

The principal opinion concedes that Agent Freeman had been informed by Specialist Stewart that the accused sold him drugs on the day of the search, for which he had paid him the previous day. Stewart also informed Freeman that he paid the accused with a bill marked by a red, felt-tip pen with the numeral "4." The opinion goes on to state, however, that Freeman took the accused into custody solely to search him for this bill and not because he had committed a crime. With this conclusion, I must disagree, for Freeman's testimony repeatedly states that he apprehended the accused. Indeed, the defense did not really contest the matter at the trial. Thus, Freeman testified:

A. . . . As a result of his [Stewart's] statement Castro was apprehended at the unit motor pool by me.

. . . . .

Q. Why did you act so promptly on the statement of Mr. Stewart that he had given the individual this bill?
A. Primarily, in order that—some

indication that we had apprehended Stewart, or some indication that Castro was involved prior to him obtaining knowledge that we knew he was involved in order that he would not dispose of the evidence.

On cross-examination, Agent Freeman testified that he took the accused "into custody" at the motor pool. As the defense counsel himself brought out, the accused "was actually physically in custody" at the time of the search. In response to the military judge's question, Freeman testified further:

A. . . . [W]e agreed to go contact Castro, apprehend him, and bring him to the office for questioning, which we did.

. . . . .

A. I was the one who placed him under apprehension. Mr. Askew was with me at the time.

Following the apprehension, the accused was taken to Freeman's office where he was informed that he was suspected of drug offenses, and of Stewart's allegations against him, and asked if he would consent to a search of his person for the marked bill. He was also advised that "any other items of evidence which he was not entitled to be in possession of, and I believe we specifically mentioned drugs and contraband items, would be seized and used as evidence against him." Accused consented to the search and, in addition, read and executed a "CONSENT FOR SEARCH" form which, among other things, stated:

These investigators are authorized by me to take from my person any letters, papers, materials and/or other property which they may desire, provided an inventory of same is made and receipt given.

To be sure, Agent Freeman also testified that the purpose of the search was to determine if the accused was in possession of the marked bill and that the accused was so informed. The accused testified that he would not have consented to the search had he known its perimeter would extend beyond the bill. But, as can be seen from the above, that was not the only evidence which the military judge was entitled to consider

in deciding the issue adversely to the accused.

Be that as it may, Agent Freeman had the accused turn out his pockets. An examination of the accused's wallet failed to disclose the marked bill. He then examined a small black notebook removed from the accused's jacket pocket to see if the bill was concealed therein. While leafing through it, he observed a written list of names, with sums of money recorded opposite them. Among the names were those of Specialist Stewart and one "Moose" whom Stewart had identified to Freeman as a person who also bought drugs from the accused. Freeman had encountered several similar lists in previous investigations that had proven to be records of drug sales. In addition, he had received information from other sources, including the civil authorities, that the accused was trafficking in drugs.

Based on the foregoing, Freeman seized the notebook. As I have noted, in my opinion, that seizure was lawful.

First, despite the military judge's observation that he did "not think it was a search pursuant to an arrest," it clearly seems to be supportable on that basis. Freeman repeatedly made it clear that the accused was apprehended not only to find the bill on him but for questioning in light of Stewart's information and accusation. The statement regarding apprehension for "preserving the evidence," viewed reasonably, means no more than that Freeman desired to apprehend the accused before the latter learned of Stewart's arrest and disposed of the incriminating bill. Indeed, Freeman testified that he intended to search the accused even if he refused his consent. His resort to obtaining that consent was no more than a decent effort on the part of a police officer to obtain the accused's cooperation rather than simply to order him to submit to an invasion of his privacy, as Freeman was entitled to do.

Once he had apprehended the accused, Agent Freeman was entitled fully to search the accused's person. Gustafson v Florida, 414 US 260 (1973); United States v Robinson, 414 US 218 (1973); United States v Brashears, 21 USCMA 552, 45 CMR 326 (1972). The question whether he was entitled to seize the notebook during the search depends upon whether Freeman could reasonably conclude that it constituted evidence that would aid in the accused's conviction for his alleged drug offenses. Bretti v Wainwright, 439 F2d 1042 (5th Cir 1971). If it did constitute such evidence, the agent was entitled to take custody of it. Warden v Hayden, 387 US 294 (1967); United States v Whisenhant, 17 USCMA 117, 37 CMR 381 (1967).

All concede that Freeman was properly leafing through the notebook while searching for the marked bill. In doing so, he observed the list of names, including two whom he had been informed were purchasing drugs from the accused. Sums of money were set down opposite their names as well as the others listed. His prior police experience with such lists had taught him that they usually related to the accused's customers. Based on that experience and his knowledge of the accused's dealings with Stewart and "Moose," it was entirely reasonable for him to conclude that this was evidence of the accused's guilt and to seize the book. Bretti v Wainwright, supra. It was an item of evidence in plain view and he was rightfully entitled to take possession of it. Harris v United States, 390 US 234 (1968); United States v Decker, 16 USCMA 397, 37 CMR 17 (1966); United States v Burnside, 15 USCMA 326, 35 CMR 298 (1965).

Secondly, all parties concede that the search itself was valid as based on the voluntary consent of the accused. The only argument is whether Agent Freeman exceeded his scope by seizing the notebook. Again, to reach the majority's conclusion that he did so, one is required to overlook the evidence that Freeman's experience led him to regard the book as a list of the accused's customers and thus as evidence supportive of Stewart's statements. This I cannot do. As noted above, a police officer is not required to disregard evidence of crime which he comes across during the course of a perfectly valid search. Coolidge v New Hampshire, 403 US 443 (1971); Warden v Hayden, supra; United States v Barone, 330 F2d 543 (2d Cir 1964); Davis v

United States, 327 F2d 301 (9th Cir 1964).

Thus, this case is not all like United States v Cady, 22 USCMA 408, 47 CMR 345 (1973), in which we held a consensual search must cease from the moment that the accused withdrew his consent, and that its scope is restricted by the terms of the consent. Here, Freeman validly examined the notebook. He discovered evidence that had a close connection with the crime that he was investigating. It was evidence in plain view. Despite the understanding of the parties, I would conclude that he was entitled to seize it in the course of his duties. United States v Burnside, supra.

I would affirm the decision of the U S Army Court of Military Review.